[Civ. No. 3952. Third Appellate District.—December 31, 1929.]

UNIVERSITY OF SOUTHERN CALIFORNIA (a Corporation), Respondent, v. FRANK BRYSON, as Administrator, etc., Appellant.

Everett W. Mattoon, County Counsel, W. Sumner Holbrook and Gordon Boller, Deputies County Counsel, and Merriam, Rinehart & Merriam for Appellant.

Scarborough & Bowen for Respondent.

THOMPSON (R. L.), J.—This is an appeal from a judgment for plaintiff on a note representing a $200,000 sub-

scription to an endowment fund for the University of Southern California.

Sarah P. Livingston executed and delivered to the University the following note:

"Estate Note Sarah P. Livingston
"University of Southern California Million Dollar Jubilee Campaign.

"Los Angeles, May 24th, 1918.

"In consideration of my interest in Christian education and in consideration of others subscribing toward raising of a Million Dollars for endowment and equipment for the University, I hereby subscribe and will pay to the University of Southern California, at Los Angeles, California, the sum of Two Hundred Thousand........Dollars ($200,000.) on the following terms and conditions:

"1. The entire sum of One Million Dollars asked, shall be pledged on or before June 12, 1918.

"2. This subscription shall be. due and payable one (1) day after my death, and out of my estate.

Name: SARAH P. LIVINGSTON

"Witness: JOHN HEDLEY

"1245 Stevenson Ave., Address: Redondo Beach District: Pasadena, Cal. Charge: California."

(Indorsement in writing on reverse side.)

"The sum of Two Hundred Thousand Dollars ($200,000) is donated to the Board of Trustees, University of Southern California, with the distinct provision that the full amount shall be used as an endowment fund to further the work of Foreign Missions, in the preaching of the Gospel to people in heathen countries, as may be hereafter determined by the Board of Trustees, University of Southern California.

"(Signed) SARAH P. LIVINGSTON.

"May 24th, 1918.

"Witness: JOHN HEDLEY."

The entire fund of $1,000,000 was subscribed before June 12, 1918. Notice of an acceptance of the Livingston subscription was sent to her. Relying upon the payment of these notes, an administration building was commenced, college courses enlarged and obligations incurred by the university. Mrs. Livingston died May 25, 1923. Upon proceedings duly had an administrator of her estate was duly

appointed and qualified. June 3, 1924, a verified claim for her note, which was fully described therein, was presented for payment and disallowed June 11, 1924. This action was then commenced and upon trial the court rendered judgment against the defendant for $200,000 and seven per cent interest thereon from June 11, 1924, from which judgment this appeal was perfected.

The appellant contends that (1) the subscription note was without consideration and is therefore *nudum pactum* (2) the condition of the notes to secure pledges for the aggregate sum of $1,000,000 was not fulfilled, (3) the doctrine of estoppel may not apply since the payee did not perform any acts or incur obligations in anticipation of the fulfillment of the specific purpose for which the particular subscription was made, (4) the purpose for which the pledge was made is not within the authorization of the university charter, and (5) the creditor's claim upon which the action is founded will not support a plea of estoppel.

■ The last paragraph of the foregoing copy of the subscription note or agreement was written at the request and in the presence of Mrs. Livingston by a minister of the Methodist church, and was executed at the same time and as a part of the original instrument. The entire document must therefore be construed together in determining its character and effect. (Sec. 1641, Civ. Code; *McAuliff* v. *McFadden*, 42 Cal. App. 505, 511 [183 Pac. 870] ; 8 C. J. 191, sec. 323.)

■ It is asserted that the written portion of the subscription note in the present case is repugnant to the purpose for which the general university fund was raised, as appears from the printed portion of this and other notes uniform in that respect which were executed by the subscribers, and that the indorsement on this note specifically designates the nature of the transaction as a "donation," which means a gift and precludes the possibility of contending that it was founded upon a consideration. (*Noe* v. *Card*, 14 Cal. 576, 598.)

Where a contract is partly written and partly printed, and the written matter is repugnant to the printed portion, the former will control. (Sec. 1651, Civ. Code; sec. 1862, Code Civ. Proc.) It is only when written and printed portions of the same document are repugnant, however, that

the former controls. When these separate portions are not absolutely inconsistent they should be reconciled if reasonably possible so as to give effect to the entire instrument. (Secs. 1641 and 1652, Civ. Code; 13 C. J. 536, sec. 498; 6 Cal. Jur. 280, sec. 172; *Flinn* v. *Mowry*, 131 Cal. 481, 484 [63 Pac. 724, 1006].) ▮ Construing the entire instrument in this manner, it is quite apparent the note was not intended as a mere gift without a consideration as that term is defined in section 1146 of the Civil Code. It was executed and delivered with the express reciprocal condition that other subscribers would execute similar notes with the object of raising a million-dollar fund for the "endowment and equipment" of the University of Southern California. This would furnish a consideration for the note. A gift is a voluntary transfer of property without consideration (sec. 1146, Civ. Code; 12 R. C. L. 923, sec. 1), but a donation may be founded on a consideration. (28 C. J. 621, sec. 2; 3 Words and Phrases, 3d ser., 19; *Spiers* v. *Woodhill*, 71 Mo. App. 373; *International & G. N. Ry. Co.* v. *Anderson Co.*, (Tex. Civ. App.) 174 S. W. 305, 315.) A donation is not necessarily a mere gift. While it is true that a donation is usually a gratuitous transfer of property without consideration (1 Bouvier's Law Dict. 924; 3 Words and Phrases, 1st ser., 2181), yet it may be construed to mean more than a mere gift. ▮ Where the intent of the parties to the contrary is evident from the instrument, the mere use of the term "donation" will not be accepted as conclusive evidence of an absence of consideration.

▮ We think that the language of the written indorsement on the note in this case neither destroys its validity on the ground that it requires an application of its funds to a purpose different from that which was designated in the pledges for the balance of the general jubilee endowment fund, nor for the reason that it designates a purpose beyond the scope of authority which is conferred upon the university by its charter. The University of Southern California was organized as a denominational institution "under the control and management . . . of the Southern California Conference of the Methodist Episcopal Church." It was empowered to receive and hold property "for educational purposes . . . or for the endowment of the corporation or

the institutions under its control.'' It was authorized to ''establish separate colleges or departments or institutions for the study of every and all learned and liberal professions . . . and for any scientific or other educational purposes.'' The express purposes for which the university was incorporated included education and training for the ministry. A department of religious education was maintained prior to the raising of the million-dollar jubilee fund. The first printed line of the note which was signed by each of the contributors reads, ''In consideration of my interest in Christian education, . . . I hereby subscribe,'' etc. The endorsement provides that the ''amount (of $200,000) shall be used as an endowment fund to further the work of Foreign Missions. . . . '' It is unreasonable to hold that this subscription was limited to the actual ''preaching of the Gospel in heathen countries.'' The university had no such authority and it was not its practice to send out or maintain ministers to preach the Gospel. Mrs. Livingston must be deemed to have known this and to have understood the clear printed language of the note which she signed. In this note she declared ''I subscribe'' $200,000 to the University of Southern California ''for endowment and equipment'' of that institution. With these circumstances in view we are convinced the language of that indorsement should be construed to mean ''the full amount (of the $200,000 contribution) shall be used as an endowment fund to further the work of Foreign Missions (in their service), in the preaching of the Gospel to people in heathen countries.'' This construction is in accord with good reason and tends to uphold rather than destroy the validity of the instrument. The work of foreign missions would be furthered by the education and training of not only ministers through the maintenance of a department of religion, but also by the training of secretaries, medical missionaries and the teaching of foreign languages and customs of the people in the fields in which the students plan to work. This purpose is strictly within the express powers which are conferred upon the university by its charter. Any other construction of this instrument would disregard the plain language of the face of the note and destroy the entire $1,000,000 endowment fund, for each separate contribution was conditioned upon the raising of the maximum sum.

■ The fact that the income from the $200,000 subscription was limited to the furtherance of foreign missions, or that it may have been restricted to the maintenance of a department of religious training is not fatal to the validity of the instrument or in conflict with the general purpose of the entire jubilee fund. That fund was for the "endowment and equipment" of the university. Among the regular curriculums of this educational institution was the course for religious training. The designated use of this particular subscription was therefore included in the purpose for which the general fund was raised, and for which the university was maintained.

■ In anticipation of the payment of these subscription notes into the general jubilee fund, of which the Livingston contribution was a substantial part, a new administration building was commenced in 1919 and completed in 1921 at an expense of $620,000. In this building a classroom was assigned for teaching religion and preparing students for missionary work. In anticipation of the payment of the Livingston contribution in particular the work in the department of the school of religion was greatly enlarged. Classes for the study of the aims and needs of foreign missions were added, together with instruction in the languages and customs which prevail in such fields. The plan for education in this department was reorganized under the title of "The Church and Its Program." Dr. von KleinSmid, the president of the university, testified that these courses were intended "for the preparation of young men and young women for service in foreign missions." The board of trustees approved this plan. The missionary course included study under Dr. Fisher of "Heroes of the Mission Fields; their history and times; their consecration, preparation, problems, methods, work and achievement." A library, equipment and several instructors were added to this department. The increased cost of this entire change in the religious department could not be paid from the Livingston subscription alone. But these changes were made and the increased cost of the department incurred in anticipation of and in reliance upon the substantial aid of her contribution. The president of the university said: "The entire program (affecting the church and missions) was in part relying on the Livingston donation." It was unnecessary that the obli-

gations should be incurred and the changes adopted in reliance solely upon the Livingston portion of the fund.

The activities of the university above mentioned were in furtherance of the work of foreign missions; they were in compliance with the conditions of the Livingston note and not in conflict with the purpose for which the general endowment fund was raised, or the authorized powers of the educational institution.

It is contended that the instrument in question is testamentary in character; that it is a mere executory promise, without consideration, to give a sum of money to the university, which was revocable at the option of the promisor at any time before acceptance, and which was canceled by her death.

A note may be valid as a non-negotiable instrument although it does not contain all the provisions necessary to make it negotiable. (8 C. J. 41, subd. 20.) A written instrument is presumptive evidence of consideration. (Sec. 1614, Civ. Code.) The burden of showing a want of consideration sufficient to support the instrument lies with the party seeking to invalidate or avoid it. (Sec. 1615, Civ. Code.)

The note was not invalid because it was made payable out of the estate of the maker thereof, one day after her death. A negotiable instrument is deemed *prima facie* to have been issued for a valuable consideration. (Sec. 3105, Civ. Code.) An instrument which is negotiable in form is not rendered testamentary or non-negotiable merely because it does not mature until after the death of the maker. (19 Cal. Jur. 814, sec. 17; 1 Daniel on Negotiable Inst., 5th ed., p. 53, sec. 46; *Buchtel College* v. *Chamberloix*, 3 Cal. App. 246 [84 Pac. 1000]; *Nassano* v. *Tuolumne Co. Bank*, 20 Cal. App. 603 [130 Pac. 29]; 3 R. C. L. 907, sec. 94.)

A promise to pay a subscription is ordinarily a mere offer which, in the absence of a consideration therefor, may be withdrawn at any time before acceptance. Under such circumstances the death of the promisor revokes the pledge. A mere individual promise to subscribe to a cause is not usually supported by a consideration and is therefore *nudum pactum* and unenforceable. (23 Cal. Jur. 954, sec. 2; 25 R. C. L. 1399, sec. 6; *Grand Lodge I. O. G. T.* v.

*Farnham,* 70 Cal. 158 [11 Pac. 592].) In the present case, however, the subscription note of Mrs. Livingston is not void. It was founded upon a well-recognized consideration, which was the reciprocal promises of each of the contributors to the general jubilee fund to participate to the extent of their respective pledges in the raising of a definite sum of $1,000,000. This condition was so specified in the several notes. The note of each subscriber was conditioned upon the fulfillment of the pledges of the others to raise the full amount of $1,000,000.

A mutual promise concurred in by several individuals to contribute to the payment of an aggregate sum for the benefit of a charitable, religious or educational institution in which they are all interested, is generally held to support an adequate consideration authorizing its enforcement by the promisee. (*Christian College* v. *Hendley,* 49 Cal. 347; 37 Cyc. 488; 6 R. C. L. 676, sec. 84; 38 A. L. R. 906, note VI.) This doctrine, which is termed "a promise for a promise," is criticised by certain text-writers, but it is evidently approved by the California courts. The Christian College case, *supra,* has been favorably cited on this point in *West* v. *Crawford,* 80 Cal. 19, 32 [21 Pac. 1123] and in *Matzen* v. *Morton Bldg. Co.,* 28 Cal. App. 330 [152 Pac. 317]. The principle is also supported by a large number of authorities which are cited in support of the text in Ruling Case Law, *supra,* and in the Permanent Supplement thereto.

Appellant claims this is not the law in California; that the case of *Grand Lodge I. O. G. T.* v. *Farnham,* 70 Cal. 158 [11 Pac. 592], overrules the Christian College case. We cannot agree with this assertion. The Grand Lodge case is clearly distinguishable from both the Christian College case and the present action. The facts which appear in the Grand Lodge case indicate that Farnham signed a mere subscription paper agreeing to pay $1,000 toward building a Good Templars' Home for Orphans. Other subscribers at the same time signed similar papers. There is nothing in the record to show that the document which he signed had any reference to other subscription papers, or was conditioned upon the raising of any specific fund, or upon other subscribers participating therein. No mutual or reciprocal obligation is mentioned. Unlike the present case, no reference was made to the execution of other pledges, or to the

purpose for which the fund was being raised. Nor does it appear that any work was commenced on the building or obligations incurred before the death of Farnham. In that case no promise for a promise appears; no obligations were incurred and no acts in reliance upon the fulfillment of the pledge were performed. Under such circumstances, clearly the promise was without consideration and void. After declaring that "a promise to pay a subscription like that declared on here is a mere offer which may be revoked at any time before it is accepted by the promisee," the court said, "The rule is otherwise where subscribers agree together to make up a specified sum and where the withdrawal of one increases the amount to be paid by others," and that "An acceptance can only be shown by some act on the part of the promisee whereby some legal liability is incurred or money is expended on the faith of the promise."

While American authorities are not in entire harmony as to the validity of these subscription agreements, the modern trend and the weight of authorities support the theory that the reciprocal agreements of the several subscribers or the subsequent performance of labor or incurring of obligations on the part of the promisee in reliance upon the pledge to pay, furnishes a sufficient consideration therefor, or an estoppel to deny the validity thereof. Upon the contrary, English cases regard subscriptions to charity and similar causes as mere promises without consideration which may be withdrawn at any time before acceptance, and which are, therefore, *nudum pactum*. (*Re Hudson*, 54 L. J. Ch. (N. S.) 811.) The earlier American cases follow this rule. The trend of modern authorities holds the contrary. Later authorities tend to uphold these subscription agreements for the benefit of charitable and educational institutions. In 38 A. L. R. 869, note, it is said, "The tendency now is to uphold subscriptions as valid and enforceable whenever that can be done without overstepping entirely established rules requiring consideration to uphold executory contracts. . . . Consideration is supplied where upon good faith of the subscriptions moneys have been expended, liabilities incurred, or work performed. . . . Other courts have found consideration in the mutual promises of the subscribers." Some cases distinguish between a mere promise to pay a specified sum regardless of the aggregate fund to be raised and a promise

to participate in the raising of a specific amount where each separate pledge becomes an inducement for others to subscribe.

Section 1605 of the Civil Code defines the term consideration as any benefit conferred on the promisor or any prejudice suffered by the promisee.

 When the subscription of an individual aids the organization, endowment or maintenance of a local charitable, religious or educational institution in which he is interested, it may be said he receives an indirect benefit therefrom. These are semi-public organizations which are recognized as beneficial to society. (*Nebraska Wesleyan University* v. *Griswold,* 113 Neb. 256 [38 A. L. R. 858, 202 N. W. 609]; *Amherst Academy* v. *Cowls,* 6 Pick. (Mass.) 427 [17 Am. Dec. 387].) So, also, it may be said that when an institution relying upon a promise to pay a specific sum for a particular purpose is induced thereby and does expend money, perform labor or incur obligations incident to the purpose for which the money was pledged, it necessarily suffers prejudice in so doing. This detriment is deemed by section 1605 of the Civil Code to constitute an adequate consideration upon which to enforce the agreement.

 Acts performed and obligations incurred by a promisee in reliance upon the payment of a subscription note renders the agreement enforceable and estops the promisor from refuting its validity. (25 R. C. L. 1401, sec. 8; 37 Cyc. 486–B; *Lasar* v. *Johnson,* 125 Cal. 549 [58 Pac. 161]; *Buchtel College* v. *Chamberloix,* 3 Cal. App. 246 [38 A. L. R. 881, note, 84 Pac. 1000]; *Furman University* v. *Waller,* 124 S. C. 68, 33 A. L. R. 615, note 625 [117 S. E. 356].)

The appellant contends that the changes in the religious program of the university, the labor performed and the obligations incurred in the construction of the administration building and otherwise were not solely in anticipation of the payment of the Livingston note, but were partially in reliance upon the payment of other pledges and therefore furnished no ground for estoppel. It is true that this performance was only partially in reliance upon the payment of the Livingston note. It is, however, not necessary that a particular subscriber's promise should be the sole inducement for the performance of work or the incurring of obliga-

tions. It is sufficient to create an estoppel if it is a substantial cause inducing the activity on the part of the payee, or if the particular pledge in conjunction with others induces the promisee to perform labor or expend money in carrying out the enterprise for which the money is pledged. (*Furman University* v. *Waller*, 124 S. C. 68 [33 L. R. A. 615, 117 S. E. 356].)

It is asserted that the condition of the note that $1,000,000 should be pledged for the endowment and equipment fund of the university was not complied with. We cannot ·agree with this. The aggregate sum of $1,148,834 was subscribed. This sum included the $200,000 note in question, which was primarily a contribution to the endowment and equipment fund from which the obligations for maintaining a department for religious training and for furthering the work of foreign missions were paid. This note was therefore properly included in the general fund. The aggregate amount also included a note of $100,000 signed by W. T. Watts, which is challenged. In January, 1919, after the fund had been completed, Mr. Watts and the university entered into a written agreement by the terms of which real property was conveyed to the university, apparently, in satisfaction of this note, conditioned upon the grantor retaining the rents and income therefrom during his lifetime. There is evidence that this property was worth "much more than $100,000 to the University." This was not denied, for, when plaintiff called a witness to establish its value, this colloquy occurred between counsel: "Mr. Scarborough: We have testimony here that the value of the property was over· $100,000. Mr. Holbrook (attorney for defendant) : . . . If it makes any difference, it amounted to more; it does not make any difference whether it amounted to less." It should therefore be assumed that the defendant accepted this property as of a valuation in excess of $100,000. Two other items are challenged, to wit, $57,464 in notes for which the university was obligated to extend scholarship privileges under which it waived the usual tuition charges. There were also subscriptions amounting to $32,800 to which obligations on the part of the university were imposed to pay annuities to the makers thereof in the form of interest. The last two items aggregated $90,264. While the principal represented by the last two classes of

notes became a part of the general endowment fund, it may be said the income therefrom was not presently available and there may be merit in saying these notes, because of their conditions, did not comply with the purpose of raising a million-dollar fund as declared by the notes. However, deducting these sums there would still remain a fund of $1,058,570. Considering the evidence as a whole, we are of the opinion that the findings of the court that $1,000,000 endowment and equipment fund was subscribed before June 12, 1918, is adequately supported by the evidence. The note merely required the fund to be pledged.

Finally, it is contended the form of the creditor's claim was insufficient upon which to maintain this action, and that there was a fatal variance between the allegations of the complaint and the evidence adduced, in that the complaint failed to adequately set out the particulars upon which the claimant relied, to wit, the doctrine of estoppel which would be raised by the proof of the performance of labor or the incurring of obligations by the payee in reliance upon the payment of the note.

The creditor's claim contained a complete copy of the note upon which the action was founded, together with the statement that the subscription note "was delivered to and accepted by the University . . . upon the terms and for the purposes therein set forth, and that the entire sum of $1,000,000 asked was pledged on or before June 12, 1918, in fulfillment of the conditions thereof . . . " This was a sufficient compliance with section 1494 of the Code of Civil Procedure. (11 Cal. Jur. 704, sec. 411; *Crocker-Woolworth Nat. Bank* v. *Carle*, 133 Cal. 409 [65 Pac. 951]; *Pollitz* v. *Wickersham*, 150 Cal. 238, 249 [88 Pac. 911].) The consideration of the note was presumed. ▇▇ Nor was there a variance in the proof of the allegations of the complaint which set out the note in full and the nonpayment thereof and recited that "upon the faith of and relying upon the said subscription, with other subscriptions to said fund, the plaintiff . . . erected a building and purchased equipment for the same . . . and employed teachers, and equipped a department to further the work of foreign missions in the preaching of the Gospel to people in heathen countries." These allegations were sufficient upon which to admit evidence of the performance of work and the in-

curring of obligations in reliance upon the promise to pay the note so as to furnish consideration therefor and estop the denial of its validity.

The judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 30, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 27, 1930.