[No. D008884. Fourth Dist., Div. One. May 25, 1990.]

LA JOLLA MESA VISTA IMPROVEMENT ASSOCIATION, Plaintiff and Appellant, v.
LA JOLLA MESA VISTA HOMEOWNERS ASSOCIATION et al., Defendants and Respondents.

**[Opinion certified for partial publication.†]**

† Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of parts I and II.

COUNSEL

John A. Meanley and Steven S. Kane for Plaintiff and Appellant.

Maurile C. Tremblay, David R. Endres, John T. Farmer, Edgar R. Nield and Tuverson & Hillyard for Defendants and Respondents.

OPINION

**BENKE, Acting P. J.—**

## INTRODUCTION

The residential development which is the subject of this dispute has been governed by a declaration of conditions and restrictions (CC&Rs) since 1957. By their terms the CC&Rs were scheduled to expire on January 1, 1987, unless within the six months preceding January 1, 1987, they were extended by a majority of the homeowners in the development.

Between July 1, 1986, and January 1, 1987, a homeowners association circulated a document which extended the effective date of the CC&Rs to January 1, 2017. The extension also provided substantial modifications of the existing CC&Rs. The extension proponents, believing they had enough signatures to make the extension and modification effective, recorded their extension on December 24, 1986.

Thereafter a second homeowners association was formed. It filed the instant action which challenges the validity of the extension. The challenge

is based primarily on alleged defects in a number of the signatures obtained in support of the petition.

Following a trial without a jury, the superior court found the extension was supported by a sufficient number of valid signatures and entered judgment in favor of the defendants.

We affirm in large measure because we find homeowners who assented in writing to the extension did not have the power to unilaterally revoke their consent.

## SUMMARY

The subject of this dispute is La Jolla Mesa Vista Unit No. 1 (La Jolla Mesa Vista) which consists of 94 residential lots located in La Jolla. The original CC&Rs, recorded by the grantor on May 20, 1957, provided in paragraph 22: "EACH AND ALL OF THE FOREGOING CONDITIONS AND RESTRICTIONS SHALL TERMINATE ON JANUARY FIRST, NINETEEEN HUNDRED EIGHTY-SEVEN, unless the owners of a majority of said lots have executed and recorded at any time within six months prior to January 1, 1987, in the manner required for conveyance of real property, a writing in which they agree that said Conditions and Restrictions shall continue for a further specified period . . . ; provided, also that the above and foregoing Conditions and Restrictions may be modified, after said termination date, at the times and in the manner hereinabove provided for the extensions of said Conditions and Restrictions; all of which extensions and modifications shall become effective on the expiration date of the Conditions and Restrictions in force at the time of such extension or modification."

The La Jolla Mesa Vista Homeowners Association (Homeowners) was formed by residents to implement the CC&Rs and to otherwise promote and manage the common interests of the homeowners. In 1985 Homeowners proposed extending the CC&Rs and conducted meetings in which the comments of individual homeowners were solicited. Thereafter Homeowners retained counsel, who drafted an extension and modification of the existing CC&Rs. The extension would have modified the CC&Rs by replacing the 1957 version with a new set of provisions.

Homeowners and its individual members circulated the extension during the last half of 1986. When the extension was recorded on December 24,

1986, signatures from the owners of 52 of the 94 lots had been obtained.[2] However, before the extension was recorded, the owners of three of the fifty-two lots signed rescissions of their consent to the extension petition. Between December 24, 1986, and December 31, 1986, four more rescissions were executed.

On January 30, 1987, the La Jolla Mesa Vista Improvement Association (Improvement), an unincorporated association, filed a complaint against Homeowners and four individuals, Jack Bauman, Brendan O'Sullivan, Louis Besbeck and William Knowles. Improvement alleged it was composed of individual owners of lots in La Jolla Mesa Vista. Improvement alleged Homeowners' recorded extension was not enforceable against its members because a majority of the development's owners had not consented to the extension in the manner required by paragraph 22 of the original CC&Rs. Improvement also alleged the modification set forth in the petition was beyond the scope of change contemplated or permitted by paragraph 22. Improvement alleged these facts gave rise to claims for quiet title, declaratory relief, slander of title and cancellation of an instrument.

Trial without a jury commenced on March 28, 1988. Initially the defendants argued Improvement lacked standing to contest the extension because it did not itself own any lots in the development. The trial court took the standing defense under submission and proceeded to hear the merits. Thereafter Improvement presented evidence of defects in a number of the signatures on the extension. Improvement presented no evidence with respect to its allegation the modification set forth in the petition was beyond the scope of change permitted by paragraph 22.

Following presentation of the evidence the trial court found no defects in any of the disputed signatures and thus found the extension was valid. The court also found Improvement had standing to brings its claims.

Judgment was entered on August 15, 1988, and Improvement filed a timely notice of appeal.

---

[2] Although each signature was not notarized, the persons who obtained the signatures appeared before notaries and attested to the authenticity of the signatures. (See Civ. Code, § 1195.)

## ISSUES ON APPEAL

Improvement again argues the extension is not supported by validly executed signatures representing a majority of the development's homeowners.[3]

## DISCUSSION

## I, II*

. . . . . . . . . . . . . . . . . . . . . .

## III

*The Extension and Modification Were Approved by a Majority of the Lot Owners*

The parties agree approval from 48 lot owners was needed to make the extension and modification effective. The parties further agree that at the time the extension and modification were recorded, signatures purporting to represent 52 lots were on the petition. On this appeal Improvement challenges the signatures provided for 11 of the 52 lots. We find that Improvement's challenges as to seven of the lots have no merit; thus we find the needed majority and do not consider Improvement's challenges to the signatures provided for the remaining lots.

A. Signatures on the Petition Were Binding and Could Not Be Rescinded

As to six of the lots (Nos. 12, 22, 49, 58, 72, 86S), Improvement's challenge is based solely on the fact that after signing the extension the owners of those lots executed purported "rescissions" of their agreement to the extension and modification.[8] The trial court rejected this challenge because it found that by executing the extension the owners bound themselves under

---

[3] In unpublished portions of the opinion we discuss Homeowners' objection to Improvement's standing and Improvement's contention paragraph 22 of the original CC&Rs did not permit their wholesale replacement.

*See footnote, *ante,* page 1187.

[8] As to a seventh lot, No. 19, Improvement's challenge is based both on the existence of a rescission and the fact that although legal title to the lot was held in the name of a trustee of a revocable trust, consent to the extension was signed by the settlors and beneficiaries of the trust.

a contract which they could not unilaterally rescind without good cause. (See Civ. Code, § 1689. The trial court further found Improvement had not shown good cause for any of the rescissions.

Like the trial court we find the owner's signature on the petition was sufficient to create a binding contract which could not be unilaterally rescinded. The only case we have been able to locate which deals directly with this issue is *Russell* v. *Wallace* (1929) 30 F.2d 981, 982 [58 App.D.C. 357] (*Russell*). In *Russell* the court enforced a racially restrictive covenant which had been created by circulation of a written instrument among property owners. The court rejected a property owner's attempt to withdraw from the covenant before all the property owners had assented to its terms. "The chief consideration for he contract was the mutual promise and covenant of the signers, each with the other. Mutual agreements of this kind, entered into for a valuable consideration, are upheld on the theory that the subscribers are banding together for the accomplishment of an object which is of common interest to all, and which can only be obtained by their combined performance. The consideration for each subscriber is the promise already made by others who have signed or by those who will subscribe. The contract becomes, therefore, of such a nature that a subscriber may only withdraw when an unreasonable time has been consumed in procuring the signatures of all the parties who are required to make up the agreement." (*Ibid.*)

Although *Russell* is no longer valid insofar as it holds racially restrictive covenants are enforceable (see *Shelley* v. *Kraemer* (1948) 334 U.S. 1, 20 [92 L.Ed. 1161, 1184, 68 S.Ct. 836, 3 A.L.R. 2d 441]), we believe its explanation of covenants established by mutual subscription is still good law. Our conclusion is based on statutes and regulations which govern "common interest developments"[9] in California and holdings in analogous charitable subscription cases.

---

[9] " 'Common interest development' means any of the following: (1) A community apartment project.
"(2) A condominium project.
"(3) A planned development.
"(4) A stock cooperative." (Civ. Code, § 1351, subd. (c).)
" 'Planned Development' means a development (other than a community apartment project, a condominium project, or a stock cooperative) having either or both of the following features: (1) The common area is owned either by an association or in common by the owners of the separate interests who possess appurtenant rights to the beneficial use enjoyment of the common area.
"(2) A power exists in the association to enforce an obligation of an owner of a separate interest with respect to the beneficial use and enjoyment of the common area by means of an assessment, which may become a lien upon the separately owned lot, parcel, or area in accordance with Section 1367." (Civ. Code, § 1351, subd. (k).)

Common interest developments are the subject of the Davis-Stirling Common Interest Development Act. (Civ. Code, §§ 1350-1373.) They are also subject to regulations promulgated by the Department of Real Estate. (See Cal. Code Regs., tit. 10, § 2792 et seq.) Civil Code section 1357, subdivision (a), provides: "The Legislature finds that there are common interest developments that have been created with deed restrictions which do not provide a means for the property owners to extend the term of the declaration. The Legislature further finds that covenants and restrictions, contained in the declaration, are an appropriate method for protecting the common plan of developments and to provide for a mechanism for financial support for the upkeep of common area including, but not limited to, roofs, roads, heating systems, and recreational facilities. If declarations terminate prematurely, common interest developments may deteriorate and the housing supply of affordable units could be impacted adversely.

"The Legislature further finds and declares that it is in the public interest to provide a vehicle for extending the term of the declaration if owners having more than 50 percent of the votes in the association choose to do so."

In turn Civil Code section 1357, subdivision (b), provides in part: "A declaration which specifies a termination date, but which contains no provision for extension of the termination date, may be extended by the approval of owners having more than 50 percent of the votes in the association or any greater percentage specified in the declaration for an amendment thereto."

The procedures by which members of common interest developments exercise their rights, including the right to extend CC&Rs, are set forth, in part, in section 2792.17 of title 10 of the California Code of Regulations. Under section 2792.17, subdivision (f) of title 10 of the Code of Regulations, CC&Rs should provide that "[a]ny action which may be taken by the vote of members at a regular or special meeting . . . may be taken without a meeting if done in compliance with the provisions of Section 7513 of the Corporations Code." Section 7513, subdivision (a), of the Corporations Code in turn provides in part: "[A]ny action which may be taken at any regular of special meeting of members may be taken without a meeting if the corporation distributes a written ballot to every member entitled to vote on the matter. Such ballot shall set forth the proposed action, provide an opportunity to specify approval or disapproval of any proposal, and provide a reasonable time within which to return the ballot to the corporation." Significantly, Corporations Code section 7513, subdivision (d), provides: "Unless otherwise provided in the articles or bylaws, *a written ballot may not be revoked*." (Italics added.)

Although the record does not disclose the common ownership of realty which would make the La Jolla Mesa Vista development a common interest development and therefore directly subject to the foregoing statutory and administrative provisions (see Civ. Code, § 1351), those provisions nonetheless are helpful in interpreting the provisions which in fact were employed by the association. Civil Code section 1351 is helpful in that it is a legislative recognition of the practical importance of efforts to renew CC&Rs. Here, without renewal of the CC&Rs, owners in the La Jolla Mesa Vista development would be without the protection which may be responsible in large part for establishing the value of their residences.

The Department of Real Estate regulations governing the process by which decisions are made by common interest developments are helpful in that by incorporating the election scheme set forth in the Corporations Code, the department has provided administrative recognition that efficient procedures must exist by which collective decisions are reached. Of particular importance here is the provision in Corporations Code section 7513, subdivision (d), for irrevocable ballots. Plainly, where the provisions of Corporations Code section 7513, subdivision (d), apply, individuals cannot unduly delay or frustrate decision-making by repeatedly changing their minds. Thus the statute and the regulation which has incorporated its provisions serve as recognition that certainty, finality and promptness in decision making, which are fostered by irrevocable balloting, are important interests shared by all members of a common interest development or other colletive endeavor.

■ In our view the benefits to be derived from renewal of the CC&Rs coupled with the benefits gained from a procedure which resolves the renewal issue with certainty and finality are sufficient consideration to support the irrevocability of the consents obtained by Homeowners. This conclusion is consistent with a long line of charitable subscription cases. "If 'a number of subscribers promise to contribute money on the faith of the common engagement, or the accomplishment of an object of interest to all, and which cannot be accomplished save by their common performance, then it would seem that the mutual promises constitute reciprocal obligations.'" *Christian College* v. *Hendley* (1864) 49 Cal. 347, 350; see also *University of South. California* v. *Bryson* (1929) 103 Cal.App. 39, 49 [283 P. 949]; *Board of Home Missions, etc.* v. *Manley* (1933) 129 Cal.App.2d 541, 544 [19 P.2d 21]; *First Trust etc. Bank* v. *Coe College* (1935) 8 Cal.App.3d 195, 199 [47 P.2d 481].) Here, renewal of the CC&Rs could not be accomplished without the mutual consent of a majority of the homeowners; by analogy to the charitable contribution cases, a person who has given his assent to the

extension is bound for a reasonable period of time by the assents previously obtained and by assents which are later obtained.

In sum then we reject Improvement's argument that homeowners were free to rescind their consents to the extension. Where, as here, the written procedures established forobtaining consent to extensions or modifications to CC&Rs do not give an assenting member of a development the right to unilaterally withdraw his or her consent, such a right will not be implied.

■ In addition, contrary to Improvement's argument, we have no trouble finding the language used in the extension and modification was in fact sufficient to express the parties' intention to be bound by its terms. The extension provides: "The undersigned desire to extend and amend said Declaration of Conditions and Restrictions, all as herein provided. [¶] Now, THEREFORE, *the undersigned hereby extend and amend* said Declration of Conditions and Restrictions as follows." (Italics added.)

■ We also have no difficulty upholding the trial court's finding no good cause for rescission existed. Improvement presented no evidence of fraud, mistake, undue influence, or any other grounds for rescission. [10]

B. The Signature of Daniel Rigoli was Sufficient to Bind Lot 80.

Lot 80 was held by the Minnie Rigoli Investment Trust. Under the original trust instrument executed on March 1, 1984, Minnie Rigoli and her son Daniel Rigoli were cotrustees. However, on July 24, 1986, only Daniel Rigoli executed the extension and modification. Relying on Probate Code section 15620 which provides that "[u]nless otherwise provided in the trust instrument, a power vested in two or more trustees may only be exercised by their unanimous action," Improvement argues the absence of Minnie Rigoli's signature invalidates the consent executed for Lot 80.

■ Improvement's reliance on Probate Code section 15620 is misplaced. As Improvement notes, the trust instrument provides that "All rights granted to any person by any provision of this Trust may be exercised by such person at any time during his or her lifetime and competency, *unless otherwise specifically provided herein*." (Italics added.) However the trust further provides that "Upon the death, resignation or inability of MINNIE B. RIGOLI to serve as Co-Trustee of this Trust, then DANIEL RIGOLI shall serve as successor sole Trustee of this Trust and any separate Trust created hereunder." Thus contrary to Improvement's argument the

---

[10] Indeed we also note that five of the six rescissions were themselves later "withdrawn."

trust instrument did not require proof of Minnie's *incompetence* in order to establish Daniel's right to act as sole trustee. Rather by its terms the instrument only required proof of her *inability* to serve as cotrustee.

The trial court found that Minnie was unable to serve as cotrustee and that Daniel was serving as sole trustee at the time he signed the extension. The trial court's finding was supported by the fact that on December 6, 1984, Minnie Rigoli executed an amendment to the trust in which she identifies herself only as the trustor and only Daniel is identified as a trustee; the trial court's finding was also supported by the fact that on October 28, 1986, Daniel was named Minnie's conservator. ██ Thus, like the trial court, we find that in signing the extension Daniel had the power to bind Lot 80.[11]

, Having found no valid rescissions and no defect in the consent provided for Lot 80, we have reached the majority of 48 lots needed to uphold the extension.

Judgment affirmed.

Froehlich, J., and Nares, J., concurred.

---

[11] We also note Daniel Rigoli later became the sole trustee of his mother's trust and on December 8, 1987, ratified and affirmed his prior signature on behalf of the trust. Improvement argues that because the ratification occurred after the time to extend the CC&Rs had passed, the ratification was not effective. We disagree. In general, when an act has been ratified, it is treated as if *originally* authorized. (See *Rakestraw* v. *Rodrigues* (1972) 8 Cal.3d 67, 73 [104 Cal.Rptr. 57, 500 P.2d 1401]; Civ. Code, § 2307.) Contrary to Improvement's argument, we believe application of this general rule to voting on amendments to and extensions of CC&Rs is appropriate. Indeed, given the need for efficient extension and modification procedures, the pertinent policy considerations suggest when one owner or controlling person has consented to changes in CC&Rs we should presume his acts were authorized by other co-owners or controlling persons until evidence to the contrary has been produced.