Filed 8/24/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PETER FISCHL, | B320820 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. KC068602) |
| v. | |
| PACIFIC LIFE INSURANCE COMAPNY, | ORDER MODIFYING OPINION |
| Defendant and Respondent. | NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on August 3, 2023, be modified as follows:

1. In the caption on page 1, change the spelling of the name of Defendant and Respondent from "PACIFIC LIFE INSURANCE COMAPNY" to "PACIFIC LIFE INSURANCE COMPANY".

2. In line 7 of page 21, replace the number "2434.2(c)" with the number "2534.2(c)" so the full sentence reads as follows:

> Specifically, he asserts that section 2534.2(c) "unambiguous[ly]" imposes a duty on the insurance company to perform its own analysis; as explained above, we have come to a contrary conclusion.

\* \* \*

There is no change in the judgment.

_____

LUI, P. J.          ASHMANN-GERST, J.          HOFFSTADT, J.

Filed 8/3/23 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PETER FISCHL, | B320820 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. KC068602) |
| v. | |
| PACIFIC LIFE INSURANCE COMAPNY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Peter A. Hernandez, Judge. Affirmed.

Gordon W. Renneisen and Benjamin Blakeman for Plaintiff and Appellant.

Finlayson Toffer Roosevelt & Lilly and Matthew E. Lilly for Defendant and Respondent.

\* \* \* \* \* \*

A regulation promulgated by California's Insurance Commissioner requires insurance companies who sell variable life insurance—that is, a life insurance policy that also functions as an investment vehicle—to "adopt" and "use[]" standards in order to assess whether such insurance is "suitab[le]" to recommend and issue to potential investors. (Cal. Code Regs., tit. 10, § 2534.2, subd. (c) (section 2534.2(c));[1] Ins. Code, § 10506, subd. (h).) In this case, an investor's broker conducted a suitability analysis and thereafter recommended that the investor purchase a variable life insurance policy from a specific insurance company. The investor subsequently sued the broker and the insurance company, in part on the ground that the suitability analysis was negligently conducted; the investor settled with the broker and, as part of that settlement, released *the insurance company* from liability for "all claims that result from" the broker's "negligent" "acts or omissions," including the broker's "violation of . . . any . . . state . . . regulation" "except to the extent that [the insurance company] caused, contributed to, or compounded such." This appeal therefore presents two questions. First, does section 2534.2(c) obligate an *insurance company* to conduct an independent suitability analysis before issuing a variable life insurance policy (such that the company in this case remains liable, notwithstanding the release, for *its own* failure to conduct such an analysis)? Second, does the insurance company's ratification of the broker's negligent analysis by issuing the policy to the investor render the company liable notwithstanding the release? We conclude that the answer to each question is "no." Because the trial court granted summary

---

[1]    All further statutory references are to title 10 of the California Code of Regulations unless otherwise indicated.

judgment for the insurance company after coming to the same conclusion, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

Peter Fischl (plaintiff) is a thoracic surgeon.

After the stock market crash now known as the "Great Recession" of 2008, plaintiff asked his sister to recommend a good financial planner. She recommended Gregory Acosta (Acosta).

Acosta held a license to sell life insurance and a license to sell variable products. In 2008, he conducted these sales as part of his financial planning business through two companies—namely, Gregory R. Acosta, Inc. and Diamond Bar Executive Benefit Programs & Insurance Services, Inc.(the Acosta entities). He was also a broker of variable products under the outside firms of Kestra Investment Services, LLC (Kestra) and Securities America, Inc. (Securities America) at different times. Between 30 and 40 insurance companies appointed Acosta to offer his clients the various companies' investment and life insurance products to aid in his clients' retirement planning.

One of the various products Acosta offered was a variable life insurance policy. Variable life insurance is a hybrid of a life insurance policy and an investment vehicle: It resembles a life insurance policy insofar as the policy holder pays annual premiums and the policy pays out a death benefit in the event of the holder's death; it resembles an investment vehicle insofar as the premiums are placed in a holder-specific account and invested in the market as retirement funds (with the attendant tax benefit), and may be withdrawn from the account upon retirement—although doing so reduces the amount of the death

3

benefit.  (See § 2534.1, subd. (p) [defining "Variable life insurance policy"].)

In 2008, the Acosta entities and Securities America had contracts with Pacific Life Insurance Company (Pacific Life) that authorized them to act as a broker (or "producer") for Pacific Life, and thus to offer their clients one of several variable life insurance policies from Pacific Life.  At that time, Pacific Life had adopted—and in its contracts with its brokers, obligated those brokers to "strict[ly]" adhere to—"suitability standards" that required the brokers to (1) investigate a potential applicant's financial condition and investment goals, and (2) assess whether any Pacific Life variable life insurance policy the broker was recommending was suitable as an investment vehicle for that applicant (that is, whether those policies were consistent with the "customer's needs").[2]  Consistent with his contractual obligations and longstanding practice, Acosta gathered information about plaintiff's finances and investment goals by asking plaintiff questions and sending a "fact-finder" to obtain pertinent documentation, and then assessed whether any of Pacific Life's variable life insurance policies were suitable for plaintiff.  Acosta memorialized this information—including plaintiff's income and net worth, investment knowledge and experience, and risk tolerance.  During the inquiry into suitability, plaintiff spoke only with Acosta and his employees; plaintiff at no point interacted with Pacific Life.  On the basis of his suitability analysis, Acosta recommended two Pacific Life insurance policies that he felt would be "best" for plaintiff.  To avoid duplicative coverage, Acosta also recommended that plaintiff replace the two non-

_____

**2**    Those standards in effect at that time are not included in the record.

4

variable life insurance policies he had with other companies (with death benefits totaling $1.45 million) with the two new Pacific Life policies.

On the basis of Acosta's recommendation, plaintiff filed applications to Pacific Life for a variable life insurance policy—the Select Exec III policy—and a second policy, the Versa-Flex NLG policy. In the applications, plaintiff also acknowledged that he had "considered [his] liquidity needs, risk tolerance and investment time horizon in selecting" the policies. Along with those applications, Acosta certified that he had conducted a suitability analysis. Consistent with its longstanding practice, Pacific Life did not independently examine whether either policy was "suitable" for plaintiff's financial condition and goals. In determining whether to grant the applications, however, Pacific Life's underwriters did examine whether these policies presented an "unacceptable risk" *to Pacific Life*. The underwriters determined that they did not, and issued the two policies to plaintiff.[3]

The Select Exec III policy:

● Required plaintiff to make an initial premium payment of $130,000, and then to make annual premium payments of $54,950 for each of the next six years;

● Anticipated that plaintiff would withdraw $75,374 per year as part of his retirement earnings starting in year 16 of the policy (that is, when plaintiff turned 75 years old); and

● Paid out a death benefit of $2,058,424 if plaintiff passed away during the first seven years, but then dropped the

_____

[3]     Plaintiff also purchased annuities and mutual funds from Pacific Life around the same time, but has abandoned any claims related to those acquisitions in this appeal.

death benefit to $1 million for the next seven years, and then dropped the death benefit further as each annual withdrawal was made.

The Versa-Flex NLG policy required plaintiff to make a $54,000 initial premium payment, no payment in the second year, and a $17,654 premium payment for each year thereafter; the death benefit was fixed at $1 million.

Between 2008 and 2014, plaintiff made the premium payments on the two Pacific Life policies. Because plaintiff's annual income during that period was $180,000, plaintiff did not pay the premiums entirely out of his income and instead resorted to liquidating portions of his other assets.

In 2015, plaintiff met with the investment advisor he had used prior to 2008. That advisor told him that the two Pacific Life policies were not "suitable" for plaintiff's financial condition and investment goals; on the basis of that advice, plaintiff surrendered the Select Exec III policy and let the Versa-Flex NLG policy lapse, both at a loss.

## II.  Procedural Background

### A.  *Plaintiff sues*

On July 19, 2016, plaintiff sued Acosta, the Acosta entities, Kestra, Securities America, and Pacific Life. In that original complaint, plaintiff asserted claims for fraud, negligent misrepresentation, breach of fiduciary duty, negligence, financial elder abuse, and violation of California's Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.). He alleged his damages were $495,254.78.

**B.** *Plaintiff settles with Acosta, the Acosta entities, Kestra, and Securities America*

Plaintiff's claims against Acosta, the Acosta entities, Kestra, and Securities America proceeded to arbitration. That arbitration resulted in a January 2019 settlement agreement. Acosta, the Acosta entities, Kestra, and Securities America agreed to pay plaintiff a total of $400,000. In exchange, plaintiff entered into two releases. He "release[d] and forever discharge[d]" the settling parties "from any and all claims." Plaintiff also "release[d] and forever discharge[d]" Pacific Life "from all claims that result from any of Acosta's acts or omissions . . . that are negligent . . . or that result from Acosta's . . . violation of, or refusal or failure to comply with: (1) the terms of Pac[ific] Life's Producer's Contract with Acosta;" or "(2) any federal or state law, rule or regulation . . . except to the extent that Pac[ific] Life . . . caused, contributed to, or compounded such." The release against Pacific Life carved out claims "for its direct conduct including, but not limited to, underwriting and marketing of its life insurance policies."

**C.** *Pacific Life moves for summary judgment*

After the trial court sustained successive demurrers to each of plaintiff's first, second, and third amended complaints with leave to amend, plaintiff filed the operative fourth amended complaint. This complaint named Pacific Life as the sole defendant, and asserted four claims: (1) intentional misrepresentation, (2) negligent misrepresentation, (3) negligence, and (4) violation of the UCL. This complaint quadrupled the original prayer for damages, and thus sought damages of "no less than" $1,992,000.

Pacific Life moved for summary judgment on two grounds—namely, (1) plaintiff's claims were time-barred, and (2) the release plaintiff signed bars any liability against Pacific Life based on *Acosta's* negligence in conducting the suitability analysis (which Pacific Life assumed to be negligent for purposes of the motion), and Pacific Life owes no further duty that survives the release. Plaintiff opposed the motion, including on the ground that Pacific Life had a duty—imposed by section 2534.2(c)—to *independently* analyze his suitability for the variable life insurance policy that remains actionable notwithstanding the release. Following a full round of briefing, two unauthorized surreplies the trial court struck, and a hearing, the trial court granted summary judgment for Pacific Life.

Although the court rejected Pacific Life's arguments that plaintiff's claims were untimely, the court found that Pacific Life had no duty to conduct an independent suitability analysis that survived the release. With regard to the last point, the court ruled that (1) section 2534.2(c) spells out "the requirements an insur[ance company] must meet in order to be qualified to issue variable life insurance," and in no way "impose[s] suitability standards" on those companies; and (2) even if that regulation imposes suitability standards, it "does not require that the determination of suitability be made by the insurer."[4]

D. *Plaintiff appeals*

After the court entered judgment for Pacific Life, plaintiff filed this timely appeal.

---

[4] The court also rejected plaintiff's misrepresentation claims because plaintiff offered no evidence that he had any "direct dealings" with Pacific Life, relied on any of its representations, or suffered injury due to Pacific Life's conduct in this regard.

8

## DISCUSSION

Plaintiff argues that the trial court inappropriately entered summary judgment for Pacific Life on his negligence and UCL claims because Pacific Life remains liable to plaintiff—notwithstanding plaintiff's release absolving Pacific Life of liability for claims "result[ing] from" Acosta's "negligent" "acts or omissions"—because (1) section 2534.2(c) obligated Pacific Life to conduct *its own, independent* suitability analysis, so its liability is not based only on *Acosta's* negligent analysis; or (2) Pacific Life, by subsequently issuing the two policies, "ratified" Acosta's negligent suitability analysis (thereby making that analysis its own and rendering Pacific Life "directly" liable to plaintiff).[5]

Summary judgment is appropriate, and the moving party (typically, the defendant) is entitled to judgment as a matter of law, where (1) the defendant carries its initial burden of showing either the nonexistence of one or more elements of the plaintiff's claim or the existence of an affirmative defense, and (2) the plaintiff thereafter fails to show the "'existence of a triable issue of material fact'" as to those elements or affirmative defense. (*Pereda v. Atos Jiu Jitsu LLC* (2022) 85 Cal.App.5th 759, 767 (*Pereda*); Code Civ. Proc., § 437c, subd. (p)(2).) Our task in evaluating whether these standards for granting summary judgment have been met requires us to view the evidence in the light most favorable to the losing party below, and to resolve any

---

**5** Plaintiff has expressly abandoned his misrepresentation claims on appeal. Plaintiff has also implicitly abandoned all other aspects of his negligence and UCL claims *except* those premised on Pacific Life's alleged duty to conduct an independent suitability analysis. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 555 [""Issues not raised in an appellant's brief are deemed waived or abandoned""].)

9

evidentiary doubts and ambiguities against summary judgment. (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39; *Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 605-606.) We independently review a trial court's grant of summary judgment. (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 415.) To the extent the summary judgment ruling turns on questions of statutory, regulatory, or contractual interpretation, we also review those subsidiary questions de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [statutory]; *Department of Industrial Relations v. Occupational Safety & Health Appeals Bd.* (2018) 26 Cal.App.5th 93, 100 [regulatory], *E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 [contractual].)

We now turn to the two questions presented by our review of Pacific Life's summary judgment motion.

I. **Does an Insurance Company Have a Duty to Conduct Its Own, Independent Suitability Analysis of a Variable Life Insurance Product?**

Plaintiff's first argument to overcome the release, and thereby hold Pacific Life liable for negligence and unlawful business practices under the UCL, hinges on whether an insurance company has a duty—imposed by section 2534.2(c)—to independently analyze whether its variable life insurance policy is suitable for an applicant.

The existence of a duty is a predicate for a negligence claim (*Hoffmann v. Young* (2022) 13 Cal.5th 1257, 1268), and a duty can be derived from (1) a statute (*Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 925, 929 (*Issakhani*), citing *Vesely v. Sager* (1971) 5 Cal.3d 153, 164); or (2) a regulation, but only if our Legislature has properly delegated

10

the power to promulgate that regulation-based duty to an administrative agency (*Conservatorship of Gregory* (2000) 80 Cal.App.4th 514, 522; cf. *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1389 [regulation cannot create a duty if "Legislature has withheld" power to do so]).  A UCL claim can also rest on the violation of a regulation, but for a different reason:  Business and Professions Code section 17200 makes "unlawful" conduct actionable (Bus. & Prof. Code, § 17200), and conduct that violates a regulation can be unlawful (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1383).

The regulation at issue here is section 2534.2(c).[6]  In pertinent part, it provides:

> "Every insurer seeking approval to enter into the variable life insurance business in this State shall adopt by formal action of its Board of Directors and file with the Commissioner a written statement specifying the Standards of Suitability to be used by the insurer, and applicable to its officers, directors, employees, affiliates, and agents with respect to the suitability of variable life insurance for the applicant. Such Standards of Suitability shall be binding on the insurer and those to whom it refers, and shall specify that no recommendation shall be made to an applicant to purchase a variable life insurance policy and that no variable life insurance policy shall be issued in the absence of reasonable grounds to believe that the purchase of such policy is not unsuitable for such applicant on the basis of information furnished

---

[6]     For purposes of this opinion, we will assume that our Legislature, in Insurance Code section 10506, subdivision (h), properly delegated the power to promulgate this regulation to the Insurance Commissioner.  (Cal. Code Regs., tit. 10, § 2534.)

11

after reasonable inquiry of such applicant concerning the applicant's insurance and investment objectives, financial situation and needs, and any other information known to the insurer or to the agent making the recommendation.

Lapse rates for variable life insurance within the first two policy years, which are significantly higher than both those encountered by the insurer . . . for corresponding fixed benefit life insurance policies and lapse rates of other insurers issuing variable life insurance policies shall be considered in determining whether the guidelines adopted by the insurer are reasonable and also whether the insurer and its agents are engaging, as a general business practice, in the sale of variable life insurance to persons for whom it is unsuitable. . . ." (§ 2534.2, subd. (c).)

In examining this regulation, we must answer two distinct but interrelated questions:  (1) Does the regulation require *someone* to conduct a suitability analysis before a variable life insurance policy may issue, and (2) Does the regulation require *the insurance company* to independently conduct such an analysis, even if someone else (usually, the broker) has already done so?

In answering these questions, we interpret regulations the same way we interpret statutes.  (*Hoitt v. Department of Rehabilitation* (2012) 207 Cal.App.4th 513, 523 (*Hoitt*).)  This means our """fundamental task""" is to """effectuate the law's purpose."""  (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616-617.)  Because the best indicator of the legislature's—or, in this case, agency's—intent is found in the words of the regulation itself, we start with the text.  (*Ibid.*)  If the text is

unambiguous and consistent with the purpose of the regulation, our analysis ends.  (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003; *Issakhani*, *supra*, 63 Cal.App.5th at pp. 931-932, citing *People v. Valencia* (2017) 3 Cal.5th 347, 358.)  But if it is not, we may apply the other canons of statutory construction.  (*Lucent Technologies, Inc. v. Board of Equalization* (2015) 241 Cal.App.4th 19, 40.)  If available, we must also look to how the agency that promulgated the regulation has interpreted that regulation and give that interpretation deference.  (*Sanchez v. State of California* (2009) 179 Cal.App.4th 467, 477-478.)

**A.    *Does section 2534.2(c) require* someone *to conduct a suitability analysis?***

The answer to this question is "yes."

By its plain text, section 2534.2(c) obligates an insurance company to adopt and file "Standards of Suitability" with the Insurance Commissioner as a prerequisite to "enter[ing] into the variable life insurance business in this State."  (§ 2534.2, subd. (c).)  Thus, the regulation undoubtedly dictates one of the prerequisites for being qualified to sell variable life insurance policies in California.  But, contrary to what the trial court ruled, the regulation does more.  As set forth above, the regulation goes on to define the *content* of those standards, dictating that they must "specify" that no variable life insurance policy shall be recommended or issued to an applicant unless there are "reasonable grounds to believe that the purchase of such policy is not unsuitable" for the applicant based on an investigation of the applicant's goals, financial condition, and any other pertinent information.  (*Ibid.*)  And, more to the point, the regulation mandates that the suitability standards an insurance company adopts "shall be binding on the insurer and those to whom it

13

refers." (*Ibid.*)  This last provision obligates *someone* to conduct a suitability analysis before a variable life insurance policy may be recommended or issued.  There is no agency interpretation of this regulation to the contrary.

The law and the undisputed evidence in this case indicate that it is *the broker* who typically conducts this suitability analysis.  Variable life insurance policies are a "variable product," and a different Insurance Commissioner regulation *requires* "brokers and agents selling variable products [to] comply with suitability standards."  (Cal. Code Regs., tit. 10, § 2534.44, subds. (c) & (e).)  Brokers comply with this regulation by performing that analysis themselves.  Indeed, this is confirmed by the undisputed evidence in this case, which, as noted above, shows that it is the broker who performs the suitability analysis to determine whether a variable life insurance policy suits *the applicant*, while the insurance company accepts the broker's suitability analysis and instead performs an underwriting analysis to determine whether the policy suits *the insurance company*.  This division of labor makes practical sense:  A suitability analysis presupposes the gathering of information regarding the applicant's finances and goals, and the broker is the one who must gather this same data in order to determine which products to recommend to his client *and* then to fill out applications for the products the broker ultimately recommends. (See, e.g., Ins. Code, § 10509.913, subd. (i) [defining "'Suitability information'" for purposes of annuity transactions].)

In most situations, this division of labor will have no effect on an insurance company's liability for a defective suitability analysis.  If an insurance company *itself* conducts a suitability analysis that is later determined to be negligent, the company

would of course be liable for its own negligence. (E.g., *Pereda*, *supra*, 85 Cal.App.5th at p. 768 ["[a] defendant is *directly* liable for 'his own negligence'"]; *American States Ins. Co. v. Progressive Casualty Ins. Co.* (2009) 180 Cal.App.4th 18, 34 [same].) But if a broker negligently conducts a suitability analysis, both the broker *and the insurance company* would be liable. The broker is, of course, liable to the third party for his own negligence that causes harm. (*Pereda*, at p. 768; *Bayuk v. Edson* (1965) 236 Cal.App.2d 309, 320 [agent remains liable].) But the insurance company is also liable, as the broker was acting as the company's agent in conducting the suitability analysis—either because (as here) the company contractually authorized and obligated the broker to perform that analysis, or because the company subsequently ratified the broker's conduct by adopting his suitability analysis as its own in relying on that analysis to issue a policy (rather than conducting its own analysis). (Ins. Code, § 1704.5, subd. (a) [insurer deemed to have authorized life insurance agent as its agent if it issues policy pursuant to application submitted by agent]; Civ. Code, § 2307 ["An agency may be created . . . by a precedent authorization or a subsequent ratification"]; *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 410-411 [agency may be created by contract]; *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73-74 (*Rakestraw*) [ratification creates an agency relationship and constitutes approval by the ratifier of the agent's act]; *Reusche v. California Pacific Title Ins. Co.* (1965) 231 Cal.App.2d 731, 737 (*Reusche*) [principal who has knowledge of agent's conduct can thereafter become liable by ratifying it]; *O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 288 [agent's knowledge imputed to principal].)

15

Thus, plaintiff would in the ordinary case be able to assert a claim against Pacific Life for Acosta's negligent suitability analysis. It is only because plaintiff released Pacific Life of liability for Acosta's "negligent" "acts or omissions" that we must ask whether plaintiff can sidestep that release on the theory that Pacific Life had a duty to conduct *its own, independent* suitability analysis. We now turn to that question.

**B.** ***Does section 2534.2(c) obligate an insurance company to conduct its own, independent suitability analysis, regardless of whether the broker has also conducted one?***

1. *Analysis*

The answer to this question is "no," and chiefly for two reasons.

First, the text of section 2534.2(c) all but dictates the conclusion that the regulation does *not* impose a mandatory duty on *the insurance company* to conduct its own, independent suitability analysis before issuing a variable life insurance policy. To begin, the regulation specifies that the suitability standards that an insurance company must adopt will be "used by the insurer, and [are also] applicable to its officers, directors, employees, affiliates, *and agents* with respect to the suitability of variable life insurance for the applicant." (§ 2534.2, subd. (c), italics added.) The italicized language indicates that the standards may be "used" by the company's "agents" (who are listed separately from "employees")—that is, the broker a company contractually obligates to conduct that suitability analysis or the broker who performs such an analysis upon which the company later opts to rely—which makes little sense if *the company itself* must *always* conduct that analysis. Relatedly, the

regulation specifies that the suitability standards "shall be binding on the insur[ance company] *and those to whom it refers*." (*Ibid.*, italics added.)  This italicized language also contemplates that the suitability analysis may permissibly be conducted by someone *other than* the insurance company—namely, the brokers to whom the company's standards refer.  Further, the regulation specifies that the analysis into suitability must turn on (1) information "furnished after reasonable inquiry of [the] applicant concerning the applicant's" (a) "insurance and investment objectives" and (b) "financial situation and needs," and (2) "any other information known to the insurer *or to the agent making the recommendation*."  (*Ibid.*, italics added.)  This italicized language indicates that the suitability analysis may rest in part on information known only *to the company* or *to the agent* (that is, the broker), which suggests that *either* may conduct the analysis. Lastly, the second paragraph of section 2534.2(c) obligates the Insurance Commissioner to consider the "rate[]" by which applicants purchasing variable life insurance policies let those policies lapse, as means of determining, among other things, "whether the insurer *and its agents* are engaging . . . in the sale of variable life insurance to persons for whom it is unsuitable." (*Ibid.*, italics added.)  This italicized language also contemplates that the agents—that is, the brokers—are selling the policies and conducting the suitability analysis that is a prerequisite to such sales.  These textual clues indicate that an insurance company need not conduct its own suitability analysis.

Second, the canons of statutory construction reinforce our conclusion that section 2534.2(c)'s text does not obligate an insurance company to conduct its own, independent suitability analysis.  Two canons point us to this conclusion.

17

The first pertinent canon provides that the use of "materially different language" in provisions "addressing the same subject or related subjects" is indicative of a different meaning. (*People v. Trevino* (2001) 26 Cal.4th 237, 242; *Rutgard v. City of Los Angeles* (2020) 52 Cal.App.5th 815, 827.) Akin to section 2534.2(c), Insurance Code section 10509.914 obligates either the insurance company or its broker to conduct a suitability analysis to assess whether "an annuity or the exchange of an annuity that results in another insurance transaction" is "suitable for the consumer." (Ins. Code, § 10509.914, subd. (a).) But this statute also requires insurance companies to "maintain procedures [to] review . . . each recommendation [of suitability] prior to issuance of an annuity" and to "maintain reasonable procedures to detect recommendations that are not suitable," including by "confirm[ing] . . . consumer suitability information" or conducting "interviews." (Ins. Code, § 10509.914, subds. (f)(1)(D) & (f)(1)(E).) Viewed as a whole, this Insurance Code statute puts a much heavier onus on insurance companies to conduct suitability analyses *themselves* or, at a minimum, closely audit the analyses conducted by brokers. Tellingly, section 2534.2(c) has no such verbiage. In granting the Insurance Commissioner the authority to adopt section 2534.2(c) for regulating the variable life insurance industry (Ins. Code, § 10506, subd. (h)), the Legislature chose not to require the Insurance Commissioner to mandate the same insurer-conducted suitability analysis as the Legislature requires for annuities. Thus, reading section 2534.2(c) as obligating an insurance company to conduct its own, independent suitability analysis would not only completely ignore the stark difference in language between section 2534.2(c) and Insurance

18

Code section 10509.914, but would—paradoxically—impose a greater duty under section 2534.2(c) than exists under Insurance Code section 10509.914.

The second pertinent canon counsels us to avoid construing a statute (or, as pertinent here, a regulation) in a way that would lead to absurd results. (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037; see also, *Hoitt*, *supra*, 207 Cal.App.4th at p. 523 [regulations must be construed to "make [them] reasonable and workable"].) Construing section 2534.2(c) to require an insurance company to independently assess suitability makes less sense because it is the brokers who have better access to the information necessary for that assessment: It is the brokers who gather the pertinent information about a client's finances and investment goals when they determine which of the many investment products available to recommend to a specific client; because usually (though not always) the burden is placed on the entity with superior access to evidence rather than the entity with inferior access (accord, *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1268 [noting that courts sometimes shift burdens of proof to account for "'unequal access to evidence'"]), construing the regulation to put the burden on insurance companies to conduct an independent analysis makes little sense. Reading section 2534.2(c) to mandate an independent analysis would also set up an illogical dichotomy: If an insurance company opts to sell its variable life insurance policies through employee-agents, then the employee-agent's suitability analysis is *the company's* analysis, so there will only be one such analysis; but if an insurance company opts to sell its policies through broker-agents, then the broker-agent will conduct an analysis (to assess which

19

products to sell) and the company will be required to conduct a second analysis. Yet there is no logical reason why the number of suitability analyses that must be conducted should relate to the type of sales structure an insurance company employs. Plaintiff urges that we need not be concerned with this absurdity, but we disagree. Lastly, interpreting section 2534.2(c) to require an independent suitability analysis tends to presume that brokers are incapable of assessing the suitability of various products for their clients. Yet section 2534.9 requires brokers to be specifically licensed to sell variable life insurance products. (§ 2534.9, subd. (a).) It makes little sense to require brokers to have a license to sell this specific product if they are simultaneously to be deemed legally incapable of evaluating the suitability of that product on their own.

For these reasons, we construe section 2534.2(c) as permitting an insurance company to conduct its own analysis into the suitability of a variable life insurance policy for a specific client, or instead to rely upon the suitability analysis conducted by a broker.[7]

---

[7] Because we conclude that the duty to conduct a suitability analysis may be discharged by *either* the insurance company or the broker, and that the insurance company will typically remain liable on a theory of negligence no matter who conducts that analysis, we need not address whether any duty imposed on the insurance company may be delegated to the broker under the "nondelegable duty" doctrine. That doctrine addresses whether one entity's delegation of a duty to a second entity *absolves* the first of liability. (*Maloney v. Rath* (1968) 69 Cal.2d 442, 446; *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 298; *Evard v. Southern California Edison* (2007) 153 Cal.App.4th 137, 146-147.) In this case, the only reason Pacific Life may be absolved of liability is not because

### 2. *Plaintiff's counter-arguments*

Plaintiff offers what boils down to six arguments for why section 2534.2(c) should be read to obligate an insurance company to perform its own, independent analysis of the suitability of a variable life insurance policy for each applicant.

First, plaintiff offers an alternative textual analysis of the regulation. Specifically, he asserts that section 2434.2(c) "unambiguous[ly]" imposes a duty on the insurance company to perform its own analysis; as explained above, we have come to a contrary conclusion. Relatedly, he attacks our analysis to the extent it relies on the regulation's language that a suitability analysis may look to "any other information known to the insurer *or to the agent making the recommendation*." Specifically, plaintiff argues that this language does not support our "no duty" conclusion because the "any other information" prong is just one of two sources of information that feeds into a proper suitability analysis. We are unpersuaded. What makes this language supportive of our conclusion is *not* that it is an appropriate source of information; instead, what makes it supportive is that the information may be known *either* to the company or to the broker, which suggests that *either* may conduct the suitability analysis with this additional information. Plaintiff's broader attack that our reading of this clause somehow impermissibly substitutes "or" for "and" is unhelpful hyperbole that itself rests on a misreading of the statute. What is more, our analysis of the plain text of section 2534.2(c) rests upon four different textual clues that are all inconsistent with plaintiff's reading; plaintiff's argument addresses but one of those clues.

---

its duty is delegable, but rather because *plaintiff* voluntarily released Pacific Life from that liability.

21

Second, plaintiff argues that it makes no sense for the regulation to make the suitability standards "binding" on insurance companies, but then to read it as excusing them from having to conduct their own suitability analyses. After all, plaintiff points out, the regulation bars both the recommendation *and the issuance* of a variable life insurance policy without a determination of suitability, and only the insurance company may *issue* a policy. Both of these points establish, at best, that *someone* must conduct a suitability analysis. As noted above, we agree. However, plaintiff's points do not establish *who* must conduct that analysis or, more specifically, establish that the insurance company must always conduct its own, independent suitability analysis.

Third, plaintiff emphasizes that section 2534.7 requires any "application for a variable life insurance policy" to contain three items, one of which is "questions designed to elicit information which enables the insurer to determine the suitability of variable life insurance for the applicant." (§ 2534.7, subd. (c).) Although we must consider the meaning of section 2534.2(c) in light of the broader cluster of regulations on the same topic (and of which section 2534.7 is a part) (*Issakhani*, *supra*, 63 Cal.App.5th at pp. 931-932), section 2534.7 merely states that the questions on a variable life insurance policy must help "the insurer" determine suitability without addressing—let alone prohibiting—that the insurance company may have the broker perform that determination on its behalf. What is more, the information relevant to suitability—as noted above and shown by the undisputed facts here—is the very same information a broker gathers when assessing which investment products to tailor to his client, and thus will be reflected in whatever application form

22

pertains to the products that the broker determines is suitable. In short, nothing in section 2534.7 undermines our conclusion that section 2534.2(c) gives an insurance company leeway to allow a broker to conduct the suitability analysis, although the company ordinarily remains liable if the broker is negligent in doing so.

Fourth, plaintiff urges that public policy demands that section 2534.2(c) be read to mandate an independent suitability analysis by the insurance company because brokers are economically self-interested to find every product suitable for their clients and therefore cannot be trusted to conduct an objective analysis. We reject this argument because it ignores the many ways in which this ostensible conflict of interest is constrained. Brokers must obtain a specific license to sell variable life insurance policies; if they are reckless with their suitability analyses, they may well lose that license. (Cal. Code Regs., tit. 10, § 2534.9, subds. (a) & (c); Ins. Code, § 1758.1.) Brokers also owe their clients a fiduciary duty, particularly when the clients rely on them to recommend which investment products are suitable (*Mark Tanner Constr. v. Hub Internat. Ins. Servs.* (2014) 224 Cal.App.4th 574, 584; *Marsh & McLennan of Cal., Inc. v. City of Los Angeles* (1976) 62 Cal.App.3d 108, 117; *Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.* (2004) 115 Cal.App.4th 1145, 1158; *Eddy v. Sharp* (1988) 199 Cal.App.3d 858, 865); if brokers are reckless with their suitability analyses, they can be sued by their clients for breach of that duty. Indeed, plaintiff initially sued Acosta and the Acosta entities for breach of that very duty. And, as noted above, a broker's negligently performed suitability analysis in most cases puts the insurance company on the hook, as well; if brokers are reckless

23

with their suitability analyses, insurance companies will be less likely to defer to those brokers' analyses or to authorize those brokers to sell their products, which would hurt the brokers' economic self-interest. Plaintiff's prediction that our reading of section 2534.2(c) will enable brokers to "go wild" ignores the law and reality.

Fifth, plaintiff cites his expert witness's declaration in which the witness opines that section 2534.2(c) imposes a duty upon insurance companies to conduct an independent suitability analysis. This is irrelevant because "'expert testimony is incompetent on the . . . question whether [a legal] duty [of care] exists because this is a question of law for the court alone' to decide. [Citations.]" (*QDOS, Inc. v. Signature Financial, LLC* (2017) 17 Cal.App.5th 990, 1004; *Shin v. Kong* (2000) 80 Cal.App.4th 498, 505 ["An expert cannot create a legal duty of care where none otherwise exists"].)

Sixth and lastly, plaintiff suggests that insurance companies have a duty to conduct their own, independent analysis because that is the custom in the industry. We reject this suggestion because the undisputed facts in this case are diametrically to the contrary. What is more, industry custom or practice cannot create a legal duty. (See *Sheward v. Virtue* (1942) 20 Cal.2d 410, 414 ["the doctrine of customary usage does not apply to the question of legal duty under the law of negligence"]; *Robinet v. Hawks* (1927) 200 Cal. 265, 274 [same]; *Silberg v. Cal. Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [same]; *Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 835 ["Custom cannot overcome positive provisions of statutes"].)

## II. Did Pacific Life's Conduct in Issuing the Variable Life Insurance Polices After Acosta's Negligent Suitability Analysis Constitute a "Ratification" that Renders Pacific Life Liable Notwithstanding the Release?

Plaintiff's second argument to overcome the release, and thereby to hold Pacific Life liable under his negligence and UCL claims, has three steps: (1) Pacific Life's issuance of the two policies and acceptance of plaintiff's premium payments constitutes a "ratification" of Acosta's negligent suitability analysis, (2) a principal that "ratifies" an agent's conduct becomes "directly" liable for that conduct (rather than "vicariously" liable), and (3) the release only absolves Pacific Life of *vicarious* liability for Acosta's actions, leaving its *direct* liability actionable.

We will assume that plaintiff has established the first two steps of his argument, even though the law with regard to whether ratification necessarily amounts to direct or vicarious liability is admittedly murky. A principal may implicitly "ratify" the conduct of an agent—and thereby become liable for that conduct under the law—by accepting the benefits of that conduct with "knowledge of the material facts." (*Rakestraw*, *supra*, 8 Cal.3d at pp. 73-74; *Reusche*, *supra*, 231 Cal.App.2d at p. 737; *Alvarado Community Hospital v. Superior Court* (1985) 173 Cal.App.3d 476, 481 ["a principal will be held to have ratified the agent's actions where he voluntarily accepts the benefits of the unauthorized transaction"]; *Allied Mutual Ins. Co. v. Webb* (2001) 91 Cal.App.4th 1190, 1194 ["an agent's originally unauthorized act may be ratified by implication where the only reasonable interpretation of the principal's conduct is consistent with approval or adoption"]; Civ. Code, § 2310 [ratification reaches "accepting or retaining the benefit of the [agent's] act"].) Here,

25

Pacific Life ostensibly "ratified" Acosta's suitability analysis by issuing the policies that were recommended on the basis of that analysis, and thereby obtaining the benefit of plaintiff's premium payments for those policies. Pacific Life certainly acted with knowledge that Acosta performed that analysis, although the only way that Pacific Life could know that his analysis was negligently performed—particularly in light of plaintiff's ability to pay the premiums for six years—was if Pacific Life performed its own, independent analysis and came to a different conclusion. In any event, "ratification" of an agent's conduct is usually conceived of as rendering the principal "directly" liable (rather than "vicariously" liable for that conduct) (*Dickinson v. Cosby* (2019) 37 Cal.App.5th 1138, 1159; *Shultz Steel Co. v. Hartford Accident & Indemnity Co.* (1986) 187 Cal.App.3d 513, 518, 523 [principal directly liable if he "ratifies the act"]; see generally, Rest.3d Agency, § 7.03, subd. (1)(a)), although the line between direct and vicarious liability—at least where the principal does no more than accept the benefits of the agent's acts—is a notoriously fuzzy one. (*Ritter v. Technicolor Corp.* (1972) 27 Cal.App.3d 152, 154 [even with ratification, "the agent's liability is primary, and that of the principal, who committed no moral wrong, is but secondary"]; *Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1427 ["'Vicarious liability based on the tort doctrine of respondeat superior and direct liability based on the theory of actual or ostensible agency are different liability theories which cases do not always distinguish between'"]; *Martin v. PacifiCare of California* (2011) 198 Cal.App.4th 1390, 1407 ["A claim is based on vicarious liability when a party free from fault is held liable for another party's acts or omissions. [Citation.] A claim is based on direct liability when a party is held liable for its

26

own acts or omissions"]; *Samantha B. v. Aurora Vista Del Mar, LLC* (2022) 77 Cal.App.5th 85, 109 [ratification is "an alternative" to respondeat superior].)

But plaintiff's argument fails on the third step. Contrary to what plaintiff suggests, the release does not turn on the distinction between "direct" liability and "vicarious" liability; indeed, the release does not use that distinction at all. Instead, the plain text of the release draws a different distinction: Pacific Life is released from any liability based on "claims that result from any of Acosta's" "negligent" "acts or omissions" or that "result from Acosta's" "failure to comply" with the terms of his contract with Pacific Life or any "state . . . regulation," but is *not* released from liability for its own conduct that "caused, contributed to, or compounded" Acosta's shortcomings or for "its direct conduct including . . . underwriting and marketing of its life insurance policies." Here, plaintiff's negligence and UCL claims—as he has narrowed them by the time of this appeal— seek to hold Pacific Life liable for Acosta's negligent conduct in performing the suitability analysis, which simultaneously breaches Acosta's contracts and section 2534.2(c). By issuing the policies and accepting premiums without conducting a further suitability analysis, Pacific Life certainly did not "cause[]" Acosta's defective analysis and also did not "contribute[] to" or "compound" that analysis. Pacific Life's conduct—whether labeled "direct" or "vicarious" in the eyes of the law—thus falls completely within the terms of the release; we decline plaintiff's invitation to rewrite the release to make Pacific Life's continued liability turn on a legal distinction that the release itself does not adopt. That the release uses the word "direct" to still hold Pacific Life liable for "its direct conduct including, but not limited to,

27

underwriting and marketing of its life insurance policies," is meant by context to hold Pacific Life responsible for *its own* conduct rather than to incorporate the direct and vicarious liability dichotomy used in the case law.

*     *     *

In light of our analysis, we have no occasion to reach the parties' alternative arguments regarding whether plaintiff's claims are barred by the statute of limitations.

**DISPOSITION**

The judgment is affirmed.  Pacific Life is entitled to its costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>**.

_____, J.

HOFFSTADT

We concur:

_____, P. J.

LUI

_____, J.

ASHMANN-GERST