[Civ. No. 9809.   Third Dist.   Sept. 16, 1960.]

J. L. PRICE, Appellant, v. CARL R. McCONNELL, Respondent.

L. C. Smith and Leander W. Pitman for Appellant.

Carr & Kennedy and Tebbe & Correia for Respondent.

WARNE, J. pro tem.*—This is an appeal from a judgment decreeing specific performance of an oral contract for the sale

---

*Assigned by Chairman of Judicial Council.

661 at top right

of purebred cattle which provided for the delivery of their registration papers and records.

Appellant brought this action to recover the alleged sale price of the cattle. In his complaint he set up two causes of action. The first cause of action seeks recovery of $2,807.10 as the purchase price due on an express contract for the sale and delivery of 25 Hereford heifers. The second cause of action is in the form of a common count based on an implied contract. It alleges an indebtedness from respondent in the sum of $2,807.10 for cattle "had and received." Respondent in his answer admitted the contract for the purchase and sale of the cattle, but alleged that the express contract called for the delivery of registration papers and records on the cattle in addition to the cattle themselves and that appellant refused to deliver said registration records and papers. Respondent also alleged that he was depositing the sum of $2,818.60 with the clerk of the court with the answer and making demand upon appellant for delivery of said registration papers.

Respondent also filed a cross-complaint alleging that appellant agreed to sell to respondent the purebred Herefords in question for the sum of $2,793.60 and by the terms of said agreement expressly promised and agreed to furnish to respondent the registration papers and records evidencing the necessary breeding data and information, wherein and whereby the said heifers have been and can be registered as purebred heifers, and tendered to appellant the purchase price thereof, together with the sum of $25 representing the fee for the furnishing of said registration papers and records as agreed; that the registration papers and records cannot be purchased or otherwise obtained by respondent except by the delivery of the existing papers and records now in the possession of the appellant; that said cattle cannot be sold as purebred heifers, nor can the value of the same as such purebred cattle be obtained on subsequent sale, without the delivery of said registration papers and records; that respondent has demanded delivery of said registration papers and records; and that appellant has failed and refused to deliver the same.

Appellant filed an answer denying the allegations of the cross-complaint with respect to the portions of the contract which called for delivery of the registration papers and realleged that the contract was for the sale of the cattle at so much per pound, less shrinkage, as beef cattle and not as purebred cattle.

The trial court found that a contract was entered into between the parties whereby appellant, through his agent, Floyd Santos, agreed to sell the cattle to respondent McConnell and to furnish with them the registration papers for an additional fee of $25, and entered judgment for respondent McConnell on his cross-complaint decreeing specific performance of the provisions of the contract calling for the delivery of the registration papers and records and directed the clerk to pay the $2,818.60 on deposit with the court to appellant upon his delivery of said papers and records to the respondent.

Viewing the evidence, as we must on appeal, in the light most favorable to respondent, the record reveals that appellant is a physician and surgeon residing and practicing his profession in Redding, California. He is also a cattle raiser, and at the time of the transaction involved in this action owned a ranch near Cottonwood in Tehama County and also one at Gazelle in Siskiyou County. The two ranches were under the care and supervision of appellant's foreman, James Kelley, who resided at the Cottonwood ranch. One Floyd Santos was employed at the Gazelle ranch to care for the cattle there.

Appellant testified that he had culled 25 head of heifers from his herd of purebred cattle on the Gazelle ranch which he proposed to sell because they were of a strain affected with "dwarfism," or otherwise undesirable as purebred cattle. One of respondent's employees, Mrs. Sylvia Lyday, learned from Floyd Santos that the 25 head of culled heifers were for sale. She was familiar with some of the 25 heifers through her former employment with John Trisdale who had previously sold 16 of the culled heifers to appellant. Mrs. Lyday informed respondent that these heifers were for sale and that they were of a strain affected with "dwarfism." Thereafter respondent contacted Santos for the purpose of purchasing these cattle, but as Santos did not know the price at which the cattle were to be sold he told respondent he would have to find out and let him know. At that time Santos asked respondent to submit a figure. He did so, stating that he would give 15 cents per pound for the heifers, but he wanted the papers, "That was number one"; that he had hundreds of heifers on his ranches and did not need any more unless he could get the registered heifers. It appears that Santos then called appellant by telephone, but was unable to get him at that time. Later Santos again phoned appellant, and after appellant consulted with his foreman, Kelley, Santos was advised as to the price. Respondent testified that thereafter Santos

"phoned me on November, or the 31st of October in the evening and said that Doctor Price had accepted the deal. And I said, 'Well, what is the deal?' He said, 'Fifteen cents a pound, three per cent shrink and a dollar a piece for the papers.' " Respondent accepted the offer and went over with his truck and took possession of the heifers on November 1, 1956.

Appellant acknowledged that Santos had phoned him requesting the price at which the cattle were to be sold. It appears he recognized the authority of Santos to make a sale on the ranch in order to save trucking the cattle to Cottonwood or to a salesyard. Kelley communicated to Santos a selling price at which he might sell the cattle.

Mrs. Lyday testified that she had previously discussed the matter of giving the papers with the cattle and that Santos had advised her that there might be a charge for a registration fee, $1.00 per head or $25 if McConnells were members of the Hereford Association, or $2.00 or $50 if they were not. The evidence developed that respondent was a member of the association.

Respondent testified that he asked Santos for the registration papers for the cattle and that he agreed to deliver the papers on the payment of the appropriate registration fee.

At the time the cattle were loaded in respondent's truck on November 1, 1956, Mrs. Lyday went with respondent for the sole purpose of checking ear numbers and tattoos, and Santos acknowledged that she did this. The tattoos had solely to do with the registration of the cattle as purebred stock. Santos acknowledged that he had prior to this date listed all of the heifers and entered the appropriate earmarks in the ranch books. Santos also testified that he was familiar with the requirement of the law that cattle could not be legally transported without a bill of sale unless they were registered and had papers. (Agr. Code, § 368.) However, he testified that he furnished no bill of sale. James Kelley, appellant's foreman, testified that Santos phoned him twice in reference to the sale of the heifers as follows: "Q. Now was there any other conversation following that one between you and Mr. Santos? A. About three or four days later, he phoned me back and asked me about the papers then. Q. Now what did he say? A. Well, he wanted to know what they had to do, or how to get the papers for the heifers. I told him to discourage the fellow buying the papers and telling him why; that they was [sic] a carrier line of cattle and that's the reason why we was

[*sic*] getting rid of them. If he insisted, then $50 or $75 apiece for the papers; that we didn't have all the papers for all of the cattle anyhow, because there were two of them, I knew that we got from Dr. Truesdale that they lost the papers.''

The record further shows that appellant received a call from Santos informing him that there was a man at the ranch who was willing to pay 15 cents per pound for the heifers; and that he (appellant) then saw Kelley at the ranch and directed Kelley to call Santos and authorize him to go ahead and close the deal at 15 cents per pound for the heifers, if the price were for the cattle without the registration papers. There is no evidence in the record that respondent was so informed.

On the day of the sale of the heifers respondent's wife mailed a post card addressed to appellant at Redding, California, advising of the purchase and inquiring about the registration papers. Upon receipt of this post card appellant telephoned respondent and informed him that the heifers were sold as commercial unregistered cattle and not as purebred or registered livestock; that the registration papers were not part of the sale; that Santos had no authority to sell the heifers as purebred heifers with appellant being obligated as part of the sale to furnish registration papers; that the cattle were not sold by the head but by the pound; and that the sale was rescinded. He also requested the return of the heifers.

After several telephone conversations between appellant and respondent, appellant under date of November 15, 1956, wrote a letter to respondent in which he formally repudiated and disaffirmed the alleged unauthorized conduct on the part of Santos in entering into said contract of sale on behalf of appellant.

██ Even if this be true, we are of the opinion that when appellant filed suit to recover on the express oral contract he ratified Santos' unauthorized acts of including the records and registration papers as a part of the contract of sale. Appellant's suit was not one for rescission or trover. His first cause of action was on an express contract for sale and delivery of the cattle, and when he filed his action with full knowledge that respondent was contending that the transaction included the delivery of the registration papers and records, he necessarily ratified the agreement actually made by his agent Santos.   ██   A principal may ratify an un-

authorized act of his agent by bringing an action based thereon. (*First Nat. Bank* v. *Reed,* 198 Cal. 252 [244 P. 368] ; *Mannon* v. *Pesula,* 59 Cal.App.2d 597, 605 [139 P.2d 336].) And in 1 Mechem on Agency (2d ed.), section 446, at page 329, we find the law stated as follows : ''One of the most unequivo-cal methods of showing ratification of an agent's act is the bringing of an action at law based upon the validity of such act. The bringing of such an action manifests very clearly a determination to abide by the act, to regard it as valid, to enforce its performance. If the voluntary acceptance of the benefits of the act will ordinarily work a ratification, as it has been seen to do, a fortiori will the endeavor by legal process to secure those benefits—to compel performance, accomplish the result.'' Nor can he split the agency transaction into separate parts and take the benefits without the burden. Thus, with full knowledge of all the material facts, appellant, having ratified a part of the individual transaction, ratified the entire transaction. (2 Cal.Jur.2d, Agency, § 101, p. 765.)

■ Likewise, having ratified the contract by suing upon it, appellant is now precluded from claiming a rescission.

Appellant also contends that the trial court erred in de-creeing specific performance. We feel that specific perform-ance was proper under section 1788 of the Civil Code irre-spective of any equitable limitation. The section reads as follows : ''Specific Performance. Where the seller has broken a contract to deliver specific or ascertained goods, a court having the powers of a court of equity may, if it thinks fit, on the application of the buyer, by its judgment or decree direct that the contract shall be performed specifically, without giving the seller the option of retaining the goods on payment of damages. The judgment or decree may be unconditional, or upon such terms and conditions as to damages, payment of the price and otherwise, as to the court may seem just.''

■ By the enactment of this section, as stated in *Hunt Foods, Inc.* v. *O'Disho,* 98 F.Supp. 267, 270, ''the legislature of the State of California unquestionably had in mind the liberalization of the law regarding specific performance of contracts for the sale of chattels. *Vide Bomberger* v. *Mc-Kelvey,* 35 Cal.2d 607, 220 P.2d 729 ; *Pittinger Equipment Co.* v. *Timber Structures Inc.,* 189 Or. 1, 217 P.2d 770.''

Liberally construing the statute as meaning what it says the trial court, in the light of the evidence in this case, was clearly vested with the power and discretion to decree specific performance of the contract in question. (1 Witkin, Summary

of California Law, Sales [7th ed.], § 78, p. 556.) ██ Further, the respondent testified that the heifers in question possessed the same general background as the cattle he had on his ranch; that these particular cattle fitted into his breeding program; and that he could not have bought on the open market heifers with the same background which would fit into his breeding program as these breeding heifers would. Under these facts it appears that the breach of the contract to transfer or furnish registration papers could not with any degree of certainty be duplicated or adequately compensated in damages, and hence the general rule that equity will not enforce specific performance of a sale of personal property where the breach may be adequately compensated does not apply here.

██ Nor is there merit in appellant's contention that the contract cannot be enforced since it would violate the statute of fraud. Here the buyer actually accepted and received the cattle. A contract for the sale of any goods or choses in action of the value of $500 or upward is enforceable when the buyer has accepted part of the goods, though there is no memorandum in writing of the contract or sale signed by the party to be charged or his agent in that behalf. (Civ. Code, §§ 1624a and 1724.)

██ Nor do we agree with appellant that the trial court erred by refusing to permit the action to be tried by a jury. The cross-complaint presented an action in equity, and hence "The constitutional guaranty of the right to a jury trial does not apply to actions involving the application of equitable doctrines and the granting of relief that is obtainable only in courts of equity. Accordingly, a jury trial cannot be demanded as of right in such actions. . . ." (29 Cal.Jur.2d 485, and cases cited therein.)

No other points presented in the briefs require discussion. The judgment is affirmed.

Van Dyke, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied October 11, 1960, and appellant's petition for a hearing by the Supreme Court was denied November 9, 1960.