[Nos. D003318, D003462. Fourth Dist., Div. One. Oct. 18, 1985.]

ALVARADO COMMUNITY HOSPITAL, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
VERONICA PEGG et al., Real Parties in Interest.

**COUNSEL**

Shelley A. Bayer, Dummit & Agajanian and Scott McFall for Petitioner.

No appearance for Respondent.

Thomas F. Friedberg and Frank, Roseman, Freedus & Mann for Real Parties in Interest.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Ellen A. Pansky as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**WIENER, J.**—The principal question presented in these consolidated petitions for writ of mandate is whether a client, defrauded when her attorney settled a lawsuit without authorization and absconded with the funds, may seek and obtain reimbursement of the settlement proceeds from the State Bar's client security fund (CSF), and at the same time pursue the original lawsuit against the defendant who paid the proceeds to the fraudulent lawyer. We conclude that such a client cannot both accept the benefits of her lawyer's negotiated settlement and continue to sue the settling defendant. The client's acceptance of money from CSF operates as a ratification of the settlement and in the absence of any allegations of bad faith, discharges the defendant from any further liability. We also decide that because of the circumstances of this case our holding should be prospective only.

### FACTUAL AND PROCEDURAL BACKGROUND

Veronica Pegg (Pegg) jointly with her husband (who died in Nov. 1980) filed a wrongful death action on April 23, 1980, on account of the death of the Peggs' son, against Alvarado Community Hospital and another defendant who is not a party to this writ proceeding. Pegg's attorney, Bambic, without Pegg's knowledge or consent, agreed with Alvarado in October 1981 to settle the case for $15,000. Bambic forged Pegg's signature both on a general release of the claim against Alvarado, dated October 13, 1981, and on Alvarado's settlement draft for $15,000 dated November 4, 1981. Bambic obtained the court's dismissal with prejudice of the action as to Alvarado, entered November 9, 1981.

In February 1983, Pegg received a letter from Bambic saying he was no longer in practice and had transferred the file to another attorney. After hearing nothing further she, in June 1983, consulted Attorney Roseman, who had originally referred her to Bambic. She retained Roseman's law firm in August 1983. An associate in that firm, Friedberg, began to investigate the circumstances of Bambic's disappearance and by December 1983 located him incarcerated at Boron Federal Penitentiary in Riverside County,

California. Friedberg also found out at that time from counsel for Alvarado that the case had been settled, and so informed Pegg by letter dated December 28, 1983. Pegg repudiated the settlement, saying she had known nothing of it and had not authorized it. In January 1984 she brought the matter to the attention of the San Diego County District Attorney and also the California State Bar, seeking from the latter agency reimbursement from CSF.

Pegg's new law firm did not receive a copy of the settlement draft from Alvarado until July 1984, and contend it was not until that time that they could definitely establish that Pegg's signature had been forged on the check. At that point they began actively participating in the attempt to secure recovery from the State Bar CSF. They say the State Bar then obtained the court file and held it throughout their investigation of the matter, until January 1985. At some point in January 1985 the bar concluded Bambic had defrauded Pegg, causing her to sustain a "reimburseable loss" of $9,000, a sum representing her share (60 percent) of the settlement amount. The bar paid Pegg the sum of $9,000 on January 30, 1985.

On May 1, 1985, Pegg moved to set aside the unauthorized dismissal of the lawsuit. The court granted the motion, providing that Alvarado should have credit for the sum of $15,000 against any judgment which might be recovered against it.

DISCUSSION

I

The parties agree on the basic proposition that an attorney must be specifically authorized to settle and compromise a claim. ■ An attorney "has no implied or ostensible authority to bind his client to a compromise settlement of pending litigation and that clearly he has no authority pursuant to an unauthorized settlement to enter a dismissal with prejudice." (*Navrides* v. *Zurich Ins. Co.* (1971) 5 Cal.3d 698, 702, fn. 1 [97 Cal.Rptr. 309, 488 P.2d 637, 49 A.L.R.3d 828], citations omitted; see also *Blanton* v. *Womancare, Inc.* (1985) 38 Cal.3d 396, 404 [212 Cal.Rptr. 151, 696 P.2d 645].)

■ Where an attorney purports to accept a settlement offer without his client's consent, the client has two options. First, the client may decide the unauthorized settlement was nonetheless a beneficial bargain and seek to ratify his attorney's acceptance. Alternatively, the client may determine the settlement was not beneficial, seek to disavow it and proceed with a lawsuit.

The parties cite and respectively rely on two cases which illustrate the client's two potential responses to an attorney's unauthorized conduct, and in doing so, sketch the parameters of our discussion here.

In *Navrides v. Zurich Ins. Co., supra,* 5 Cal.3d 698, an attorney purported to settle a personal injury claim with defendant insurance company for $9,000 and then absconded with the settlement funds. When plaintiff discovered what had happened, she sued the insurance company for $9,000. The Supreme Court reversed a judgment in favor of plaintiff holding that by bringing suit on the settlement agreement plaintiff necessarily ratified it; hence, ratified also the attorney's authority to accept the check from Zurich Insurance Company. Further, the court held that when the drawee bank paid that check, Zurich was discharged from all liability to the plaintiff, by analogy to the rule that when a debtor delivers his check to the creditor, or to the creditor's agent authorized to receive it, the debtor's liability ends when the check is paid; the risk of loss for the agent's dereliction falls then on the creditor.

*Whittier Union High Sch. Dist.* v. *Superior Court* (1977) 66 Cal.App.3d 504 [136 Cal.Rptr. 86] presents a similar fact pattern except that instead of suing to recover the settlement proceeds, the plaintiffs sought to have the unauthorized dismissal set aside and to proceed with their lawsuit. The court held that an unauthorized dismissal is voidable for an indefinite period and that the client is entitled to have such a dismissal vacated within a reasonable time after learning of it. (*Id.* at pp. 507-508.)

This case falls somewhere between *Navrides* and *Whittier.* Unlike *Navrides,* Pegg did not sue Alvarado to enforce the settlement agreement. Unlike *Whittier,* Pegg did more than merely seek to have the unauthorized dismissal set aside. Instead, she first sought to and in fact did successfully obtain the benefits of the settlement from the CSF. Only then did she seek to have the dismissal set aside.

■ Alvarado relies on the well-settled rule of agency that a principal will be held to have ratified the agent's actions where he voluntarily accepts the benefits of the unauthorized transaction. (Rest.2d Agency, § 98, p. 252; see 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 129, p. 736.) The theory of this rule is that where the principal knows he would not be entitled to the benefits unless he affirmed the transaction, it would be unfair to allow him both to have his cake and eat it too; that is, allow him both to accept the benefits and also repudiate the trans-

action.[1] Comment a to Restatement Second of Agency, section 98 provides: "[T]he receipt by a purported principal who knows the facts, *of things to which he would not be entitled unless the transaction were ratified* . . . indicates his consent to become a party to the transaction as it was made." (Italics added.)

Here, of course, Pegg could have followed the procedure utilized by the plaintiff in *Whittier* and simply moved to set aside the dismissal. In such case, she would have still possessed her cause of action against Alvarado but she would not have been entitled to the $9,000. Instead, however, she obtained the $9,000 from the CSF "to which [she] would not be entitled unless the [settlement] were [affirmed] . . . ." (Rest.2d Agency, § 98, p. 252.)

■ The situation is somewhat analogous to that in which the principal, by bringing suit to enforce the unauthorized contract and thereby seeking the benefits of the transaction, is held to have ratified the agent's acts in entering into the transaction. (See Rest.2d Agency, § 97, p. 250; *Navrides v. Zurich Ins. Co., supra,* 5 Cal.3d at pp. 703-704; *Price v. McConnell* (1960) 184 Cal.App.2d 660, 665-666 [7 Cal.Rptr. 695].) Ratification occurs regardless of whether the principal chooses to sue the other contracting party or, alternatively, the agent for misappropriating the proceeds of the transaction. (Rest.2d Agency, § 97 and com. a, p. 250.) We recognize Pegg did not sue Bambic to recover the $9,000. However, the State Bar's CSF acts much as an insurer of the attorney's conduct for the client's benefit. The State Bar's amicus brief makes clear the CSF hearing focused on the same issues as would have been litigated had Pegg sued Bambic for fraud.[2] Clearly, such a fraud action would have worked a ratification of the settlement negotiated by Bambic with Alvarado. We can find no principled way of distinguishing the nature of that action from Pegg's decision here to seek reimbursement of the settlement proceeds from CSF.

---

[1]Pegg's declaration itself provides the factual support for application of this principle. In describing the letter she received from the State Bar informing her that her claim had been approved, she states: "Enclosed with the letter was a check from the State Bar in the amount of $9,000.00, representing my portion of the settlement proceeds (less attorney's fees and costs) which I would have been entitled to had the case actually settled at the $15,000.00 figure."

[2]The CSF hearing did not consider the nature of the underlying action and whether the $15,000 settlement amount was in any sense reasonable under the circumstances. We have no basis in the present record to determine what might be the reasonable settlement value of the case.

We also note the converse, however; there was no evidence suggesting that the amount paid by Alvarado was other than in good faith. (See generally *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 [213 Cal.Rptr. 256, 698 P.2d 159].) We do not consider whether the outcome might be different if the settling defendant were alleged to have acted in bad faith.

Pegg argues, however, that the *Whittier* decision specifically suggested that a client might have recourse to the CSF and gave no hint that such action might be deemed to constitute a ratification of the unauthorized settlement. We believe this argument misreads *Whittier*. The court there, after having determined that the client was entitled to have the dismissal set aside, was visibly concerned with the unfairness to the defendant who, after all, had paid substantial sums to the plaintiffs' attorney believing in good faith that the case had been settled. In discursive dictum, *Whittier* attempts to suggest the manner in which the now-defrauded defendant might recover the amounts paid to the plaintiffs' former attorney. The opinion first sets out in considerable detail a theory by which the plaintiff might be liable to the defendant for funds with which the plaintiffs' attorney absconded. (66 Cal.App.3d at pp. 509-510.) The court then adds the following comment: "Finally, we point out that recourse may be available to [plaintiffs] and, derivatively, to [defendant] and its insurer, under the Clients' Security Fund established by the State Bar pursuant to Business and Professions Code section 6140.5. . . .

". . . . . . . . . . . . . . . . . . . . . . . . .

"The fraud and embezzlement that occurred here may be a reimbursable loss caused by the dishonest conduct of an active member of the State Bar acting as fiduciary on behalf of his clients." (*Id.* at pp. 510-511.)

We read this statement in the context of *Whittier*'s concern with the *defendant's* loss to quite clearly suggest the defendant might have recourse to the CSF which, since the defendant was not the attorney's client, must necessarily be derivative of plaintiffs' primary rights. We cannot believe *Whittier* meant to propose that the plaintiff could recover from the CSF while at the same time pursuing the lawsuit against the defendant. While it is true in the present case the trial court allowed Alvarado a credit of $15,000 against any judgment Pegg later recovered, such a procedure still works an injustice if Pegg recovers less than $15,000. Moreover by Pegg's actions Alvarado is put in the unenviable position of financing the lawsuit against itself to the tune of $9,000.

█ Based on the foregoing we would ordinarily issue a peremptory writ of mandate dismissing Pegg's action. We say "ordinarily" because we have concerns about the fairness of doing so in this case. To deprive a client of her day in court because of her attorney's conduct is indeed a harsh result. Moreover the issue presented is one of first impression in the context of CSF. Pegg was never told by the State Bar or her present counsel that she would lose her rights if she were to seek reimbursement from CSF. It would indeed be anomalous to permit Pegg to allegedly have redress from the very

fund designed to deal with lawyer defalcations while at the same time rely upon that act as the reason to deny her access to the courts. We can also understand how her counsel may have been misled by the dictum in *Whittier*. We believe that to deny Pegg her day in court because of the cumulative effect of Bambic's thievery, her second counsel's error, and her own naivete borders on the unconscionable.

We have decided the best method of spreading the economic loss caused by Bambic's dishonesty is to allow Pegg the opportunity to refund $9,000 to CSF as a condition of her pursuing her action against Alvarado. Thus, to the extent possible the parties will be placed in the position they would have been had Bambic never been involved. Now, if Pegg refunds the $9,000 and successfully pursues her action against Alvarado, Alvarado will be entitled to $15,000 plus interest as a setoff against the judgment. If Pegg is unsuccessful Alvarado is derivatively entitled to recoup its $15,000 from CSF. For these reasons our holding in this case shall be prospective only.

## II

Alvarado also asserts the court erred in denying its motion to dismiss the action for failure to bring it to trial within five years in violation of Code of Civil Procedure section 583, subdivision (b).

As we know, that section although literally mandatory has been judicially qualified. The California Supreme Court has set "reality above artificiality." (*Christin* v. *Superior Court* (1937) 9 Cal.2d 526, 532 [71 P.2d 205, 112 A.L.R. 1153].) The five-year period is extended where going to trial for all practical purposes would be impossible, impracticable, or futile. "What is impossible, impracticable or futile must be determined in light of all the circumstances in the individual case, including the acts and conduct of the parties and the nature of the proceedings themselves. [Citations omitted.] The critical factor in applying these exceptions to a given factual situation is whether the plaintiff exercised reasonable diligence in prosecuting his or her case." (*Moran* v. *Superior Court* (1983) 35 Cal.3d 229, 237-238 [197 Cal.Rptr. 546, 673 P.2d 216].)

In these matters, as in motions for default relief, the discretion to be exercised in determining applicability of the exception is "that of the trial court, not that of the appellate court and will be disturbed only in cases of manifest abuse." (*Feingersh* v. *Lutheran Hosp. Society* (1977) 66 Cal.App.3d 406, 411 [136 Cal.Rptr. 155], and cases there cited.)

Alvarado argues that Pegg's reliance on the absence of the file during the State Bar proceeding is specious, because despite lack of the file,

Pegg's counsel achieved a court appearance and stipulation with counsel for the codefendant, Karras. Similarly, it contends, she could have moved to set aside the dismissal even without access to the court file. Accordingly, Alvarado contends that it was not impossible, impractical, or futile for Pegg to continue to prosecute the lawsuit (by setting aside the dismissal) once she knew (in Dec. 1983) of the fraudulent settlement, hence no extension of the five-year rule is warranted in this case.

Also, Alvarado argues inapplicability of a case cited by Pegg, *Maguire v. Collier* (1975) 49 Cal.App.3d 309, 313 [122 Cal.Rptr. 510]. That case excluded from computation of the five-year period under Code of Civil Procedure section 583, subdivision (b) the period during which an adversary is in default, as well as the time during which a default judgment is in effect. Alvarado says such a situation differs from that here because a plaintiff has no opponent to pursue, and no reason to litigate further, after obtaining a default judgment against a defendant, so that it is indeed impossible and futile in such case to move the case to trial; but here, when a defendant has been dismissed from the case, it is the plaintiff's burden diligently to move the case along by having the dismissal set aside.

We highlight the following facts: the five-year rule here would normally require bringing the action to trial by April 23, 1985. The trial court, in extending the period to December 1, 1985, gave the plaintiff an extension of slightly more than seven months. We can concede, as Alvarado contends, that after Pegg learned of the fraudulent settlement in December 1983 all her delay from that point was unreasonable and counts against her. Nevertheless, she remains entitled to have excluded from the five-year period the span of time from the date of the fraudulent settlement—November 9, 1981—until the date she learned of it—December 1983—a period of nearly two years. During this period of time it was clearly impossible, impractical and futile for Pegg to have prosecuted the lawsuit against a defendant who without her knowledge had been dismissed from the suit. The realistic approach to these matters mandated in *Moran, supra,* 35 Cal.3d 229, compels that conclusion. Accordingly, the judicial exception to section 583, subdivision (b) applies here, and the trial court was well within its allowed discretion in extending the date to come to trial until December 1, 1985.

### DISPOSITION

Let a peremptory writ of mandate issue requiring the trial court to modify its orders in this proceeding by imposing as a condition of reinstatement of

this lawsuit the requirement that Pegg refund $9,000 plus legal interest to the State Bar CSF within 30 days of the date of this order.

Staniforth, Acting P. J., and Work, J., concurred.