Filed 1/8/26

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CHRISTOPHER Y. CHONG, | B341157 |
| Plaintiff, Cross-Defendant and Appellant, | (Los Angeles County Super. Ct. No. 23STCV07478) |
| v. | |
| MARDIROSSIAN AKARAGIAN LLP, | |
| Defendant, Cross-Complainant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge.  Affirmed.

---

\*      Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication as to all parts except Part II of the Discussion.

Ellis George, Keith J. Wesley, David J. Carroll, Eric M. George, Russell F. Wolpert, and Alice H. Gilbert for Plaintiff, Cross-Defendant and Appellant.

Mardirossian Akaragian, Garo Mardirossian, Armen Akaragian, and Adam Feit; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Defendant, Cross-Complainant and Respondent.

\* \* \* \* \* \*

An attorney-client relationship is also a principal-agent relationship, where the client is the principal and the attorney is the client's agent. (*Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 403 (*Blanton*).) The attorney-agent must have the client-principal's consent to settle a case (*id.* at p. 404), although the client-principal can decide to adopt—or to "ratify"—an unauthorized settlement after the fact (*Navrides v. Zurich Ins. Co.* (1971) 5 Cal.3d 698, 703 (*Navrides*)). This case presents the question: If a client-principal ratifies an unauthorized settlement after terminating the attorney-agent, does that ratification obligate the client-principal to pay the attorney their previously agreed-upon contingency fee? The general rule is that a principal's ratification of an unauthorized act retroactively converts it into an authorized act vis-à-vis the agent as long as the ratification is "truly voluntary"—that is, as long as the principal's adoption of the agent's unauthorized act (1) was not "because of duress or misrepresentation by the agent" and (2) was not "done only because the [] principal is obligated to minimize his losses caused by the agent's [unauthorized] act." (*Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73 (*Rakestraw*).) Because the client in this case had the option of rescinding the settlement

2

agreement due to lack of consent, and because the client did not have to ultimately execute the settlement agreement to avoid a loss, the client did not carry his burden on summary judgment of raising any triable issues of material fact as to whether his ratification of the settlement agreement was truly voluntary. Because the trial court also did not err in denying the client's request to continue the summary judgment hearing and properly awarded prejudgment interest, we affirm the trial court's judgment for the law firm awarding its contingency fee.

**FACTS AND PROCEDURAL BACKGROUND**

I.    **Facts**

A.    *The accident*

At around 4:20 a.m. on May 6, 2016, Christopher Chong (plaintiff) stopped his Porsche 911 in the fast lane of the 134 Freeway in Burbank, California.  He put the car in park, locked the doors, took off his shoes, reclined his seat, pulled the key out of the ignition, took off his seat belt, and fell asleep.  He was under the influence of amphetamines and benzodiazepines.

Less than 10 minutes later, a truck in the freeway's fast lane plowed into the back of plaintiff's parked car.  Plaintiff suffered catastrophic injuries, including a severe brain injury and paralysis necessitating lifelong care.

B.    *Plaintiff retains the Mardirossian firm*

In May 2018, plaintiff—acting through his mother and stepfather, who had obtained powers of attorney over his affairs—retained the law firm of Mardirossian Akaragian LLP (the firm).[1]

---

[1]    The firm name at the time of their engagement by plaintiff was Mardirossian & Associates, Inc.

After running the proposed retainer agreement by attorney Patricia Glaser, a family friend, plaintiff and the firm signed the retainer. As pertinent here, the retainer:

-- Defined the scope of the firm's engagement as "only" "represent[ing plaintiff]" "in enforcing a claim arising out of" the accident until "settlement or judgment . . . is reached." The retainer expressly excluded "independent or related matters that may arise, including . . . claims for reimbursement (subrogation) by any insurance company or public or private entity for benefits paid under an insurance policy or program," but contemplated that a separate written retainer agreement expanding the scope of engagement could be negotiated.

-- Defined the firm's compensation as 40 or 45 percent of the plaintiff's gross recovery, depending on whether the case was resolved in the first year, with the firm to pay a subset of that compensation to attorney and family friend Gerald Kroll (attorney Kroll), who had referred plaintiff to the firm in the first place. Plaintiff nevertheless retained the power to "discharge" the firm "at any time upon proper written notice" and, following such discharge, to pay "any fees under this [a]greement" for the "reasonable value of [the firm's] legal services" from the date of retention to the date of discharge (rather than the contractually agreed-upon contingency fee).

### C. *Litigation of personal injury case*
#### 1. *The complaint*

On May 7, 2018, the firm filed a complaint on plaintiff's behalf asserting claims for (1) strict products liability, against various Porsche entities, and (2) negligence, against the truck driver who rear-ended plaintiff as well as the driver's employer, Sharpe Interior Systems, Inc. (Sharpe).

4

### 2. *Post-complaint developments*

Throughout the litigation, the firm communicated with plaintiff (and his parents) entirely through attorney Kroll. Between 2016 and 2020, plaintiff received medical services, and the providers of those services and their insurers imposed liens on any potential recovery by plaintiff in his lawsuit. During that time, it also became clear that plaintiff could not "develop evidence to support any liability on the part of Porsche," and that the likelihood of prevailing against Sharpe was only 20 percent because evidence obtained in discovery indicated that the driver who struck plaintiff's parked car was not, at that time, acting within the scope of his employment with Sharpe.

### 3. *Rejected settlement offers*

In June 2019, Sharpe offered to settle the case—in a statutory offer of compromise—for $0, but for a waiver of costs. Plaintiff rejected the offer.

In December 2019, Sharpe offered to settle for $250,000. Again, plaintiff rejected the offer.

In November 2020, the firm—with plaintiff's express consent—offered to settle with Sharpe for $6 million, which was the limit of Sharpe's insurance policies. Sharpe did not accept the offer.

### 4. *Unauthorized settlement agreement reached*

By May 2022, Sharpe and the driver were the only two defendants remaining in plaintiff's lawsuit.

By that time, the insurance liens totaled over $2.8 million. Plaintiff's stepfather maintained his previously expressed concern that plaintiff "net" at least $1 million or "seven figure[s]" from any settlement after the payment of all liens and attorney fees, but "ideally" in the range of $2.5 to $3 million.

After a May 2022 mediation between plaintiff and Sharpe was unsuccessful, the firm continued to negotiate with Sharpe's counsel. On May 19, 2022, counsel for the parties agreed to a settlement in principle in the amount of $6,015,000, and had a finalized settlement agreement prepared for plaintiff's signature by May 26, 2022. Although, as noted above, plaintiff had authorized a similar settlement offer back in December 2020, plaintiff did not specifically authorize the firm to settle with Sharpe for the amount of $6,015,000 in May 2022.

5.      *Plaintiff terminates the firm*

Upon hearing of the settlement agreement, attorney Kroll called the outcome "excellent"; plaintiff said "[t]hank you"; and plaintiff's stepfather labeled the agreement "good news," but urged that it would be "very good news once the [insurance] liens go away" and stated that he "would like to hear the initial response from the insurance companies . . . before finalizing" the settlement. Attorney Kroll told the stepfather that he had already "started the ball rolling" with the insurers.

Plaintiff's stepfather nevertheless brought in another lawyer, Eric M. George (attorney George), to work pro bono to evaluate the settlement with Sharpe. On June 13, 2022, attorney George notified attorney Kroll that plaintiff's family "cannot justify going forward" with the settlement because, after the payment of outstanding liens and the firm's contingency fee, the residual amount left for plaintiff "does precious little" for him "as a practical matter." Attorney George reiterated the stepfather's directive that the insurance liens be negotiated down to lower amounts before any settlement agreement would be signed.

Throughout the rest of June 2022, the firm sent attorney George several missives explaining its view that taking the case

to trial would "likely result" in a "defense verdict" or a "small verdict with a large comparative fault allocation" to plaintiff, that it was accordingly in plaintiff's "best interest" to allow the firm to "get[] the [insurance] liens reduced substantially" through negotiation rather than go to trial, and that it would be difficult to find "competent" new "counsel" willing to go to trial on plaintiff's case due to the "difficult liability issues" in the case as well as the amount of the firm's attorney fees lien as compared with the settlement amount already set at Sharpe's policy limit.

On July 20, 2022, attorney George sent the firm a letter stating that plaintiff had "no choice other than to terminate [the firm's] representation." Plaintiff signed a substitution of counsel on August 19, 2022, identifying attorney George as his new attorney in the personal injury case.

6. *Plaintiff accepts the settlement agreement*

On August 9, 2022, Sharpe and the driver filed a motion— less than two weeks before the August 22 trial date—either to "enforce [the] settlement" agreement or to "continue [the] trial to allow S[harpe] sufficient time to file a [m]otion for [s]ummary [j]udgment, [a c]ross[-c]omplaint for specific performance [of the settlement, or an] amended answer." The motion was set to be heard on October 4, 2022.

On August 19, 2022, and claiming that "any objection" to Sharpe's motion "would be futile," plaintiff accepted the settlement agreement with Sharpe on the ground that he "ha[d] no choice but to agree to move forward to finalize the settlement."

At the final status conference on August 22, 2022, attorney George informed the trial court that "the case is settled." The court dismissed plaintiff's personal injury lawsuit with prejudice. Of the settlement amount, 45 percent—that is, $2,706,750—plus

7

costs was disbursed into a "blocked bank account" pending resolution of the firm's claim to a contingency fee.

## II. Procedural Background

### A. *The cross-complaints for declaratory relief*

On April 4, 2023, plaintiff (represented by attorney George) filed a declaratory relief action against the firm, attorney Kroll, and the insurers with liens against his recovery from the personal injury action, seeking a judicial determination of what portion of his settlement with Sharpe those defendants are entitled to receive. The firm and attorney Kroll filed cross-complaints seeking the full amount of their contingency fees.

### B. *Settlement of insurance liens at reduced amounts*

While plaintiff's declaratory relief action was pending, attorney George renegotiated the insurance liens, all the while citing to the lienholders the amount of the settlement agreement and the outstanding contingency fee owed to the firm. As a result, (1) the uninsured motorist carrier waived entirely its claim of $1,235,000, (2) one health insurance carrier and its subrogation entity settled their claims totaling $1,398,463.80 for $340,000, and (3) another health insurance carrier and its subrogation entity settled their claims totaling $1,975,919.72 for $240,964.57. The insurers were then dismissed from the declaratory relief action.

### C. *Motion for summary judgment*

On January 9, 2024, the firm filed a motion for summary judgment as to both plaintiff's declaratory relief claim as well as the firm's cross-complaint. The motion argued that plaintiff's acceptance of the settlement agreement with Sharpe ratified the firm's unauthorized conduct of reaching that settlement in the

first place; that this ratification related back to the time the settlement was reached in May 2022; and that the firm was entitled to its full contingency fee of 45 percent because plaintiff's discharge of the firm in July 2022 occurred *after* the retroactively ratified settlement was reached.

After plaintiff's request for a continuance of the summary judgment hearing was denied, plaintiff thereafter filed his opposition, arguing that his acceptance of the settlement agreement with Sharpe did not constitute a "ratification" because it was not "truly voluntary" because plaintiff had been "left with no choice" and "no realistic alternative but to" approve the settlement.[2] In support, plaintiff submitted a declaration stating that, "lacking any real choice, [he] did . . . sign a settlement agreement." Plaintiff and his parents also declared that none of them had provided the firm with consent to the settlement with Sharpe.

Following a reply brief filed by the firm and a hearing, the trial court issued a 12-page ruling on March 26, 2024, granting summary judgment. The court accepted that the firm did not have plaintiff's authorization to reach the settlement in May 2022, but ruled that "the evidence is undisputed that [p]laintiff ratified the [s]ettlement [a]greement," such that the ratification related back to the date of settlement in May 2022 and thus entitled the firm to its full contingency fee. The court acknowledged plaintiff's assertion that he "lacked 'any real choice' in signing the settlement agreement," but rejected this assertion as "speculation without evidence" and hence

---

[2] Plaintiff raised other arguments, such as the validity of the retainer agreement; the trial court rejected those arguments and plaintiff does not press them on appeal.

insufficient to raise a dispute of material fact because plaintiff "could have disavowed the [s]ettlement and face[d] trial" but instead took the advice of his new attorney (attorney George) to settle.

### D. *Award of prejudgment interest*

The firm then requested prejudgment interest dating back to the date of plaintiff's ratification of the settlement agreement—that is, August 19, 2022. After full briefing, the trial granted the motion on July 10, 2024.

### D. *Plaintiff appeals*

Judgment was entered for the firm in the amount of $3,284,151.19, constituting $2,761,380.29 in attorney fees plus $522,770.90 in prejudgment interest. Thus, plaintiff ultimately received approximately $2,149,000 of the funds from the settlement with Sharpe.

Plaintiff timely filed this appeal.[3]

## DISCUSSION

In this appeal, plaintiff argues that the trial court (1) erred in granting summary judgment because there are triable issues of fact as to whether plaintiff's conduct in signing the settlement agreement constituted ratification, and (2) abused its discretion in denying plaintiff's request to continue the summary judgment hearing.

---

[3] Plaintiff and attorney Kroll stipulated to dismiss their claims against one another. Attorney Kroll is not a party to this appeal.

**I. The Trial Court Properly Granted Summary Judgment**

    **A. *Pertinent law***

        1. *Law governing summary judgment motions*

Summary judgment is appropriate, and the moving party (typically, the defendant) is entitled to judgment as a matter of law where (1) the defendant carries its initial burden of showing, as pertinent here, the existence of an affirmative defense (which includes ratification), and (2) the plaintiff thereafter fails to show the "existence of a triable issue of material fact" as to that affirmative defense.[4] (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 853; *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618; *Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 500; Code Civ. Proc., § 437c, subds. (a), (c), (o)(1) & (2), (p)(2); see also *Knapp v. Ginsberg* (2021) 67 Cal.App.5th 504, 529 [ratification is an affirmative defense].) In independently evaluating those shifting burdens, we liberally construe the evidence in support of the party opposing summary judgment and resolve all doubts concerning that evidence in favor of that party. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286; *Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 874; Code Civ. Proc., § 437c, subd. (c).) Nevertheless, a plaintiff's "responsive evidence that gives rise to no more than mere speculation cannot be regarded

---

**4** As for the firm's cross-complaint that is essentially the flip-side of plaintiff's declaratory relief action, a cross-complainant meets its burden moving summary judgment by "prov[ing] each element of" its cross-claim; in opposition, the cross-defendant must "show that a triable issue of one or more material facts exists as to the" cross-claim. (Code Civ. Proc., § 473c, subd. (p)(1) & (2).)

as substantial, and is insufficient to establish a triable issue of material fact" for purposes of defeating summary judgment. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163; *Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1144-1145 [party "'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture'"].)

2. *Law governing ratification*

"As a general proposition[,] the attorney-client relationship, insofar as it concerns the authority of the attorney to bind his client by agreement or stipulation, is governed by the principles of agency." (*Blanton, supra*, 38 Cal.3d at p. 403; *Moving Picture Machine Operators Union v. Glasgow Theatres, Inc.* (1970) 6 Cal.App.3d 395, 403.) Although the very retention of an attorney, as well as the attorney's specialized knowledge, empowers the attorney-agent to "'bind the client[-principal] in procedural matters arising during the course of the action [if those procedural matters are] ancillary[] or incidental'" (*Blanton*, at pp. 403-404, quoting *Linsk v. Linsk* (1969) 70 Cal.2d 272, 276-277), the attorney-agent does not have the power to "'impair the client's substantial rights or [a] cause of action itself'" without the client's "'specific[] authorization'" (*Blanton*, at p. 404). Certain decisions—including, as pertinent here, the decision whether to settle a lawsuit—are the client's to make, and hence require the client's "specific[] authorization." (*Ibid.*; *Navrides, supra*, 5 Cal.3d at p. 702, fn. 1 ["an attorney must be specifically authorized [by the client] to settle and compromise a claim"]; *Alvarado Community Hospital v. Superior Court* (1985) 173 Cal.App.3d 476, 480 (*Alvarado*) [same].)

12

Just as a principal can ratify an agent's unauthorized act by approving that act after the fact, so too can a client-principal ratify an attorney-agent's unauthorized settlement by approving that settlement after the fact. (*Navrides*, *supra*, 5 Cal.3d at p. 703 ["It is well settled that a client may ratify the unauthorized actions of his attorney"]; *W. Bradley Electric, Inc. v. Mitchell Engineering* (2024) 100 Cal.App.5th 1, 16 [same]; see generally Civ. Code, § 2307 ["An agency may be created, and an authority may be conferred, by . . . a subsequent ratification"].)

An agent ratifies his principal's prior, unauthorized act by "adopt[ing]" that act "as his own" "in some manner," which has the "effect" of retroactively "treat[ing] the [agent's unauthorized] act as if [it had been] originally authorized by [the principal]." (*Rakestraw*, *supra*, 8 Cal.3d at p. 73; *Estate of Stephens* (2002) 28 Cal.4th 665, 673; *La Jolla Mesa Vista Improvement Assn. v. La Jolla Mesa Vista Homeowners Assn.* (1990) 220 Cal.App.3d 1187, 1198, fn. 11 ["when an act has been ratified, it is treated as *originally* authorized"].) Ratification may be either (1) express, such as when the principal explicitly adopts the agent's prior act, or (2) implied, such as when the principal engages in conduct from which an "intent[] to consent to or adopt the [agent's prior] act may be fairly inferred," although such intent "should rest on unequivocal evidence." (*Rakestraw*, at p. 73; *StreetScenes v. ITC Entertainment Group, Inc.* (2002) 103 Cal.App.4th 233, 242 (*StreetScenes*); *Gates v. Bank of America National Trust & Savings Association* (1953) 120 Cal.App.2d 571, 577.) An intent to adopt an agent's prior act will be inferred—and ratification will be implied—when a principal "voluntarily accepts the benefits of the unauthorized transaction"; critically, the principal's acceptance of *any* benefit of the prior act constitutes

13

an implied ratification because any other rule would allow the principal to impermissibly "have his cake and eat it too" by taking the benefits of the agent's prior unauthorized act while simultaneously disclaiming the burdens. (*Alvarado*, *supra*, 173 Cal.App.3d at p. 481; *Navrides*, *supra*, 5 Cal.3d at p. 704; *Rakestraw*, at p. 72, fn. 4; Civ. Code, § 2311 ["Ratification of part of an indivisible transaction is a ratification of the whole"].)

A principal's ratification of his agent's prior, unauthorized act not only binds the principal to the legal consequences of that act vis-à-vis third parties who relied on the agent's act, but can also exonerate the agent from liability *to the principal* for the agent's breach of duty in engaging in the unauthorized act in the first place.[5] Ratification exonerates the agent from liability only when that ratification is "truly voluntary"—that is, when the principal, having "complete knowledge of the transaction [and] the power to rescind," nevertheless "fail[s]" to rescind and thereby "full[y] accept[s]" the prior act as his own. (*Rakestraw*, *supra*, 8 Cal.3d at pp. 74-75; *Pacific Vinegar*, *supra*, 152 Cal. at pp. 511-512.) Ratification is not "truly voluntary"—and the agent is not exonerated from liability for engaging in the unauthorized act—when the principal's adoption of the agent's unauthorized act is (1) "because of duress or misrepresentation by the agent" (*Rakestraw*, at p. 73; Rest.2d Agency, § 416 ["ratification . . . by the principal of an unauthorized act done by an agent . . .

---

5       The legal standards for when ratification binds the principal to a third party rather than their agent are not necessarily the same (*Blanton*, *supra*, 38 Cal.3d at p. 403; *Pacific Vinegar & Pickle Works v. Smith* (1907) 152 Cal. 507, 511 (*Pacific Vinegar*)); we deal here only with the standard in the latter situation.

14

releases the agent from liability in damages . . ., except when the principal . . . is caused to ratify by the misrepresentation or duress of the agent"]), or (2) "done only because the [] principal is obligated to minimize his losses caused by the agent's [unauthorized] act" (*Rakestraw*, at p. 73; *Pacific Vinegar*, at pp. 511-512; Rest.2d Agency, § 416, com. c ["the agent is not relieved from his initial liability" if "the affirmance" by the principal is done "in order to protect himself from loss"]).

### B.    *Analysis*

The trial court did not err in granting summary judgment for the firm because there are no triable issues of material fact as to whether plaintiff's ratification of the settlement agreement was "truly voluntary."  Although ratification and duress are typically questions of fact (*Streetscenes*, *supra*, 103 Cal.App.4th at p. 242; *CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 645), questions of fact may be "determined as a matter of law where the underlying facts are undisputed [citation], or the evidence is susceptible of only one reasonable conclusion" (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1191).  That is the case here.

As the moving party, the firm bore the initial burden of establishing a "truly voluntary" ratification that would exonerate it of liability for its unauthorized act of entering into the settlement agreement with Sharpe.  The firm carried this burden.  It is undisputed that plaintiff in August 2022 expressly and explicitly adopted the settlement agreement.  It is also undisputed that plaintiff, at that time and with the assistance of able counsel, knew that he could oppose Sharpe's motion to enforce the settlement agreement and thereby rescind it, failed to

15

do so, and instead opted to fully accept the agreement's benefit of a more than $6 million payout.  That constitutes a prima facie case of a "truly voluntary" ratification.  (*Rakestraw*, *supra*, 8 Cal.3d at pp. 74-75; cf. *Weiner v. Mullaney* (1943) 59 Cal.App.2d 620, 637 [no adoption by principal "amount[ing] to an exonerating ratification" where agent "failed to make a full disclosure of the facts surrounding" a stock transaction and when principal "finally learned the true situation . . ., it was no longer within her power to rescind the transaction and her only recourse was to salvage what stocks were left on hand"].)

The burden thus shifted to plaintiff to adduce evidence raising a triable issue of material fact.  Plaintiff did not carry this burden.  Plaintiff urges that his ratification was not "truly voluntary," but the sole evidence he presented on this question was his own declaration and the declaration of his stepfather that each felt plaintiff had been "left with no choice" and "no realistic alternative but to" approve the settlement.

This conclusory assertion is insufficient by itself to raise a triable issue of fact.  (*Marshall v. Packard-Bell Co.* (1951) 106 Cal.App.2d 770, 774 ["[g]eneral allegations of duress, coercion, threats, compulsion, etc., are merely conclusions of the pleader and are insufficient without a further statement of particular facts to raise any issue of duress"]; see generally *Moua v. Pittullo, Howington, Barker, Abernathy, LLP* (2014) 228 Cal.App.4th 107, 116 ["'[A]n issue of fact is not raised by "cryptic, broadly phrased, and conclusory assertions"'"].)  Plaintiff presented no evidence from which we might infer that he lacked complete knowledge of the agreement or otherwise lacked the power to rescind it.

Even if we ignore this evidentiary deficiency, plaintiff's showing still falls short of establishing that his ratification of the

16

settlement agreement was not "truly voluntary."

As to possible duress or misrepresentation by the firm, plaintiff introduced no evidence of misrepresentation and his declaration fails, as a matter of law, to establish "economic duress."[6]  Economic duress entails "threats to business or property interests by the use of coercion and/or wrongful compulsion"; critically, and as pertinent here, "'it is not [economic] duress . . . to threaten nonperformance of a contract,'" to threaten "'to withhold a legal right for the enforcement of which a person has an adequate [legal] remedy,'" or to forego legal remedies for "business reasons." (*U.S. Hertz, Inc. v. Niobrara Farms* (1974) 41 Cal.App.3d 68, 81, italics omitted; *London Homes, Inc. v. Korn* (1965) 234 Cal.App.2d 233, 240; *River Bank America v. Diller* (1995) 38 Cal.App.4th 1400, 1425.) On appeal, plaintiff argues that the firm wrongfully refused to take his case to trial in violation of the retainer.  But even if we ignore that the evidence in the record shows that the firm, prior to being discharged by plaintiff, urged plaintiff to accept the settlement but at no point explicitly stated it would not represent him at trial (and at worst declined to state whether it would repudiate the retainer by declining to represent him at trial), plaintiff's argument at most establishes that the firm "threaten[ed] nonperformance of [its] contract[ual]" duty to proceed to trial or withheld a legal right for which plaintiff

---

6  Although plaintiff sought to amend his complaint to add allegations relating to fraud while the summary judgment motion was pending, the trial court denied plaintiff's request and plaintiff does not challenge that ruling or otherwise press the fraud theory on appeal.

Plaintiff neither argued nor presented evidence that the firm employed any sort of *physical* duress.

17

retained the adequate legal remedy of rescission, neither of which is enough to constitute duress. Instead, the undisputed evidence shows that plaintiff, with the aid of able new counsel, was faced with the options of either repudiating the settlement as unauthorized, proceeding to trial, and losing the $6 million payout, or accepting the settlement and trying to negotiate down the liens—for business reasons, plaintiff went for the latter option. This is not economic duress. (Accord, *Alvarado*, *supra*, 173 Cal.App.3d at p. 480 [ratification of unauthorized settlement agreement occurs, vis-à-vis a third party, when client elects between ratifying the settlement or "seeking to disavow" the settlement and proceeding with the lawsuit].)

Nor did plaintiff accept the settlement agreement to minimize the losses caused by the firm's unauthorized act. The unauthorized settlement agreement did not cause plaintiff any *loss* that needed to be minimized; it conferred upon him a $6 million-plus *gain*. (Cf. *Pacific Vinegar*, *supra*, 152 Cal. at pp. 510-512 [principal's ratification of agent's making of unauthorized loans to third parties did not exonerate agent when principal ratified the loans in order to get *some* measure of recompense in borrower's bankruptcy proceedings to avoid further losses on those loans]; Rest.2d Agency, § 416, com. c [same].) And even if we were to consider a "loss" to include an agent's lost opportunity to obtain a larger gain through a jury verdict, it was not the firm's actions—but plaintiff's failure to rescind the settlement agreement—that caused that "lost opportunity" and hence that "loss." (Cf. *Pacific Vinegar*, at pp. 511-512 [hypothetical principal's ratification of agent's unauthorized sale of wheat for $0.50 per bushel may not be voluntary, when $1.00 per bushel was the going price, and where

18

principal had "no power . . . to rescind the sale"].)

Plaintiff resists this conclusion with what boil down to three further arguments.

First, plaintiff argues that his ratification was not "truly voluntary" and that he was under duress because the firm's unauthorized settlement agreement did not address the outstanding liens and because the firm's insistence that it was still owed its contingency fee "prevented [plaintiff] from securing new counsel" to represent him at the upcoming trial. But this argument does not apply the legal test for "economic duress," which, as explained above, excludes a threat not to perform a contract—which is, at most, what plaintiff's argument asserts.

Second, plaintiff argues that there are triable issues of fact as to whether the firm performed its obligations under the retainer and on the reasonable value of the legal services the firm provided plaintiff under a quantum meruit theory of recovery. While there may be disputes of fact on these issues, those disputes are not material. Because the undisputed facts establish that plaintiff ratified the settlement agreement, that ratification relates back to the May 2022 date the settlement agreement was reached—such that there is no need to assess the reasonable value of the firm's services because the firm is entitled to its full contingency fee, as it had obtained a settlement while still representing plaintiff,[7] and any subsequent deficiency in its services becomes irrelevant.

---

[7] Because the firm's 45 percent contingency fee was calculable—and hence ascertainable—as of the date plaintiff ratified the $6,015,000 settlement agreement on August 19, 2022, we reject plaintiff's subsidiary challenge to the imposition of prejudgment interest on the ground that it was not ascertainable

19

Third, plaintiff argues that *Shell Oil Co. v. Silicon Valley Bank* (9th Cir. 1995) 47 F.3d 1176 [1995 U.S. App. LEXIS 3962] dictates a result in his favor. It does not. Aside from being a federal decision—and an unpublished, memorandum of disposition at that—which is at most, persuasive rather than binding (*Gray v. Quicken Loans, Inc.* (2021) 61 Cal.App.5th 524, 528, fn. 2), it is not persuasive because it merely sets forth the general rule that ratification is not truly voluntary if entered into to "minimize losses" and then concludes that the appellant "established a triable issue of fact" as to ratification without any analysis whatsoever of how that rule applied to the facts of that case (*Shell*, at *5).

## II.    The Trial Court Did Not Abuse Its Discretion in Refusing to Continue the Summary Judgment Hearing

Plaintiff also argues that the trial court procedurally erred in granting summary judgment because plaintiff was wrongly denied a continuance of the hearing on that motion.

### A.    *Pertinent background*

The firm filed its motion for summary judgment on January 9, 2024, with a March 26, 2024 hearing date. That meant plaintiff's opposition was due by March 12, 2024. A week

---

because the firm was only entitled to the reasonable value of its services under a quantum meruit theory. (Civ. Code, § 3287, subd. (a); *Rus, Miliband & Smith v. Conkle & Olesten* (2003) 113 Cal.App.4th 656, 671-676 [attorney who withdraws forfeits contractually agreed-upon rate, but may recover fees under a quantum meruit theory]; *Swafford v. Goodman* (1952) 115 Cal.App.2d 105, 110, italics omitted ["A claim upon a quantum meruit for the reasonable value of services or materials is unliquidated until the time of judgment and therefore does not bear interest prior to judgment"].)

before that deadline, plaintiff filed an ex parte application requesting that the summary judgment hearing be continued to mid-June 2024; the application listed what boil down to seven reasons—namely, (1) the case was "very new" because it had been filed just a year before; (2) the firm set the summary judgment hearing on "the very first possible date" authorized by statute; (3) plaintiff had "outstanding" "document demands" that were not due until *after* plaintiff's opposition; (4) the firm's January 2024 responses to discovery were deficient; (5) plaintiff had depositions of attorney Kroll and the firm's attorneys set for late April 2024; (6) the firm had recently produced "very incriminating documents" that plaintiff needed to assess; and (7) one of plaintiff's attorneys was transitioning to a different job and the newly assigned attorney was getting up to speed.

Following an opposition to the continuance request, and a hearing, the trial court denied plaintiff's request because his "showing [was] not strong enough."

## B. *Pertinent law*

Code of Civil Procedure section 437c, subdivision (h), provides that if the "facts essential to justify opposition" to a summary judgment motion "may exist but cannot . . . be presented," the trial court shall grant a continuance "to permit affidavits to be obtained or discovery to be had" to obtain those essential facts. (Code Civ. Proc., § 437c, subd. (h).) The seemingly mandatory nature of such a continuance is triggered only if the party seeking a continuance in order to oppose summary judgment submits a declaration showing "'(1) the facts to be obtained are essential to opposing the motion; (2) there is [a] reason to believe such facts may exist; and (3) the reasons why additional time is needed to obtain these facts.'" (*Frazee v. Seely*

21

(2002) 95 Cal.App.4th 627, 633-634; *Chavez v. 24 Hour Fitness USA, Inc.* (2015) 238 Cal.App.4th 632, 643 (*Chavez*); *Lerma v. County of Orange* (2004) 120 Cal.App.4th 709, 715.) A declaration does not trigger a *right* to a continuance merely by asserting that further discovery is contemplated. (*Insalaco v. Hope Lutheran Church of West Contra Costa County* (2020) 49 Cal.App.5th 506, 518.) If a party seeking a continuance does not make the necessary showing, a continuance is not mandatory and instead lies within the court's discretion. (*Menges v. Department of Transportation* (2020) 59 Cal.App.5th 13, 25.) We review the discretionary denial of a continuance for an abuse of that discretion. (*Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 596.)

### C.    *Analysis*

The trial court here did not err in denying a continuance.

Plaintiff's showing fell short of what was necessary to trigger a *right* to a continuance. Of the seven reasons plaintiff provided in support of his request for a continuance under Code of Civil Procedure section 437c, subdivision (h), only those related to discovery were pertinent to a mandatory continuance. But the summary judgment motion dealt solely with the affirmative defense of ratification, and plaintiff failed to tie the uncompleted discovery to that issue. The document demands and depositions plaintiff cited sought information related to prior consent to the settlement with Sharpe, but whether the firm was authorized to enter into the settlement agreement is unrelated to whether plaintiff subsequently ratified that agreement months later.

The trial court also did not abuse its discretion in electing not to issue a discretionary continuance. In considering whether a discretionary continuance is warranted, courts may consider (1)

22

"how long the case has been pending," (2) "how long the requesting party had to oppose the motion," (3) "whether the continuance motion could have been made earlier," and (4) "the question whether the evidence sought is truly essential to the motion." (*Chavez, supra*, 238 Cal.App.4th at p. 644.) Although the case had not been pending for a particularly long time, plaintiff waited a month after the summary judgment motion was served to propound his document demands, waited seven weeks to set the depositions, never filed a motion to compel as to any deficient discovery responses, and waited nearly two months to seek a continuance. And, as noted above, the discovery did not pertain to the ratification issue animating the summary judgment motion.

## DISPOSITION

The judgment is affirmed. The firm is entitled to its costs on appeal.

## **CERTIFIED FOR PARTIAL PUBLICATION**.


_____, P. J.
HOFFSTADT


We concur:


_____, J.
MOOR

_____, J.
KUMAR\*

---

\*     Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.